UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTEO TROTTO,

>     *Plaintiff,*

v.                                                        No. 22-cv-12058-PBS

MICHAEL RODRIGUES,

>     *Respondent.*

## REPORT AND RECOMMENDATION

LEVENSON, U.S.M.J.

### INTRODUCTION

Petitioner, Matteo Trotto, who is in the custody of the Commonwealth of Massachusetts, seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Docket No. 1.

In May 2014, a Massachusetts jury convicted Petitioner of murder in connection with the disappearance of Kevin Harkins, who was last seen when Petitioner beckoned him out of a Worcester barroom nearly 20 years earlier, in February 1994. The jury found Petitioner guilty of murder in the first degree, on a theory of joint venture felony-murder with aggravated kidnapping as the predicate felony. After review by the Supreme Judicial Court of Massachusetts (the "SJC"), Petitioner stands convicted of felony murder in the second degree.[1] Apart from

---

[1] For reasons that are not at issue in the present habeas case, the SJC vacated the jury's verdict of felony murder in the first degree and directed the Superior Court to enter judgment upon the lesser-included offense of felony murder in the second degree, with non-aggravated kidnapping as the predicate offense. *See Commonwealth v. Trotto*, 487 Mass. 708, 715–21 (2021).

*Footnote continues on following page.*

reducing the offense of conviction to a lesser-included offense, the SJC affirmed Petitioner's conviction in all other respects. *See Commonwealth v. Trotto*, 487 Mass. 708 (2021).

Judge Saris referred the habeas petition to me for report and recommendation. Docket No. 8. Petitioner filed a memorandum of law in support of the habeas petition. Docket No. 15. The Commonwealth filed an opposition, Docket No. 19, and Petitioner filed a reply brief, Docket No. 20. On November 15, 2023, I held a hearing on the petition. Docket No. 25.

In this Court, Petitioner advances three main arguments in challenging the constitutionality of his conviction and confinement. He contests:

- The reasonableness of the SJC's conclusion that the trial evidence was sufficient to support a conviction for felony murder.

- The reasonableness of the SJC's determination that testimonial hearsay evidence, including a death certificate and descriptions of database searches, which was improperly admitted in violation of the Confrontation Clause of the Sixth Amendment, was harmless beyond a reasonable doubt.

- The reasonableness of the SJC's rulings with respect to the improper admission of testimonial hearsay about prior unsworn statements by a trial witness who described statements by Petitioner in which Petitioner admitted involvement in the kidnapping and killing.

I recommend **DENYING** the habeas petition for the reasons detailed below.

---

In 2017, the SJC curtailed the "felony murder" doctrine as it had been applied at trial in this case. *See Commonwealth v. Brown*, 477 Mass. 805, 825-826 (2017) (Gaziano, J., concurring, joined by majority) (abolishing "constructive malice" theory of felony murder and requiring actual malice to support felony murder conviction). That change in law, however, was prospective only; it did not affect the outcome of Trotto's appeal (*see Trotto*, 487 Mass. at 715–16) and does not raise constitutional questions cognizable upon habeas review.

I.      **Standard of Review for Habeas Cases**

The authority of federal courts to grant habeas relief for persons in state custody is governed, in the first instance, by 28 U.S.C. § 2254(d), which was added to Section 2254 as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

As the Supreme Court has emphasized, the aperture through which federal courts may view challenges to state court convictions is a narrow one:

> When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress announced such a rule. It instructed that a federal court "*shall not . . . gran*[*t*]" relief with respect to a claim that has been adjudicated on the merits in state court "*unless*" the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of this Court, or (2) based on an "unreasonable determination of the facts" presented in the state-court proceeding. § 2254(d) (emphasis added).

*Brown v. Davenport*, 596 U.S. 118, 127 (2022); *see also Foxworth v. Amand*, 570 F.3d 414, 424 (1st Cir. 2009) (quoting 28 U.S.C. § 2254(d)).

This unreasonableness inquiry prohibits habeas relief unless the petitioner can "persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme Court's] precedents." *Davenport*, 596 U.S. at 135 (quoting *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015)).

In addition to the AEDPA standard, a habeas petition is also subject to the "actual prejudice" standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Davenport,* 596 U.S. at 127 ("[W]here *Brecht* is implicated a federal court must also ensure a habeas petitioner has carried his burden under its terms before granting relief."). As discussed further below, the *Brecht* standard is particularly pertinent when a state court has inadvertently overlooked a properly preserved constitutional claim.

Application of the AEDPA standard depends on context, so I will discuss the standard of review separately with respect to each of Petitioner's three primary claims.

## II.    Sufficiency of the Evidence to Prove Kidnapping with Use of a Firearm

The felony murder charges at issue here arose from the disappearance of Kevin Harkins.[2] Harkins was last seen alive on the evening of February 15, 1994, after Trotto beckoned Harkins to step out of the Worcester bar ("Suney's") where Harkins, who lived in an apartment above the bar, often worked as a bouncer. Several eyewitnesses described seeing Trotto in the doorway of the bar, beckoning to Harkins, and one described seeing Trotto escort Harkins into a waiting car.

It was more than 18 years later that Trotto was indicted and tried for felony murder of Harkins. In reading the transcript of the trial, it is inescapable that the long period of delay was attributable, at least in part, to the difficulty of assembling compelling evidence about what happened.

The jury's verdict, considered in conjunction with the trial judge's instructions, reflects a conclusion that Trotto (alone or with others) kidnapped Harkins "'while armed with a dangerous weapon and inflict[ed] serious bodily injury thereby upon' the victim." *Trotto*, 487 Mass. at 735 (quoting Mass. Gen. L. c. 265, § 26 (aggravated kidnapping portion of kidnapping statute)). Because the aggravated kidnapping statute was enacted *after* Harkins's disappearance, the SJC found that "conviction of murder in the *first degree*, based on a crime that did not exist when the victim was killed, would amount to an unconstitutional ex post facto application of the current law." *Id.* at 715 (emphasis added). The SJC concluded, however, that the jury's finding

---

[2] Harkins's body was never found, and Petitioner contested at trial whether the prosecution had proven that Harkins had died. *See* Docket 10-15, at 81 ("Maybe he took off that night. Maybe he went away."). For purposes of the present habeas petition, however, all inferences must be drawn in favor of the verdict, and Petitioner does not contest the sufficiency of the evidence of Harkins's death.

necessarily comprehended the required element that would allow the lesser-included offense of kidnapping (which did exist in 1994) to serve as a predicate for felony-murder in the *second degree*: "that the kidnapping involved a conscious disregard of the risk to human life." *Id.* at 715–718. In effect, the SJC reasoned that Trotto was ostensibly convicted of second-degree felony-murder if the jury found: 1) that Trotto kidnapped Harkins, 2) that Trotto used a gun, or knew one of his associates was carrying a gun, in the commission of the kidnapping, and 3) that Harkins died during the kidnapping. *See id.* at 718 (citing *Commonwealth v. Watson*, 388 Mass. 536, 544 (1983) for the proposition that "use of gun tends to indicate that felony 'inherently involved a conscious disregard of risk to human life'")).

In the present habeas petition, the challenge to the sufficiency of the evidence focuses on the evidence that there was a kidnapping and that a firearm was used in connection with that kidnapping. Petitioner contends that the evidence was insufficient to permit the jury to conclude, beyond a reasonable doubt, that Trotto kidnapped Harkins with use of a firearm and was participating in an ongoing kidnapping at the time of Harkins's death.[3]

### A.   *Standard of Review*

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), solidified the principle that consideration of the sufficiency of evidence inherently encompasses a federal

---

[3] Trotto does not dispute the sufficiency of the evidence that—if believed—showed how the victim, Harkins, met his death. The jury heard direct evidence, in the form of grand jury testimony from 2012 by a witness, Anthony Carlo, Jr., to the effect that Trotto admitted shooting the victim, albeit accidentally, in a car where Trotto had been riding with Trotto's close associates, Elias Samia and John Fredette. *See* Docket No. 10-13, at 80–82. As discussed below, the admissibility of Carlo's statements was hotly contested, as was the reliability of Carlo's account about Trotto's purported admissions. For purposes of considering the sufficiency of the evidence, however, Trotto does not dispute that the evidence supported a finding that Harkins was shot in the car with Trotto, Samia, and Fredette.

constitutional right under the due process clause of the Fourteenth Amendment. In plain terms, a person convicted in state court "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial *no rational trier of fact* could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324 (emphasis added).

As the First Circuit has noted, "[u]nder clearly established Supreme Court precedent, a conviction must be sustained if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Magraw v. Roden*, 743 F.3d 1, 4 (1st Cir. 2014) (quoting *Jackson*, 443 U.S. at 319). The *Jackson* standard must be applied "with specific reference to the elements of the offense as defined by state law." *Campbell v. Fair*, 838 F.2d 1, 4 (1st Cir. 1988).

In this case, the SJC reviewed Petitioner's sufficiency claims under *Commonwealth v. Latimore*, 378 Mass. 671, 677 (1979), a state-law analogue that incorporates the *Jackson* standard. As the SJC wrote, "[w]e analyze the legal sufficiency of the evidence under the familiar *Latimore* standard, that is, whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Trotto*, 487 Mass. at 716 (quoting *Latimore*, 378 Mass. at 677). The First Circuit has held that when a state court decision is framed in terms of state law, the adjudication may receive § 2254(d)(1) deference "so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." *Leftwich v. Maloney*, 532 F.3d 20, 23–24 (1st Cir. 2008).[4] In *Latimore*, the SJC expressly adopted the federal constitutional

---

[4]As the First Circuit has noted:

> Under *Commonwealth v. Latimore*, 378 Mass. 671, 393 N.E.2d 370, 375 (1979),
> Massachusetts state courts apply a sufficiency standard that is "functionally

*Footnote continues on following page.*

standard for sufficiency of evidence challenges as set out in *Jackson*; accordingly, the SJC's

review of Petitioner's sufficiency claims is due the deference properly accorded to state courts

applying federal constitutional law. *See Latimore*, 378 Mass. at 677–78 (adopting the *Jackson*

"no rational trier of fact" standard).

With the post-*Jackson* enactment of AEDPA, the "no rational trier of fact" *Jackson*

inquiry is additionally subject to the unreasonable-application standard set forth in § 2254(d)(1).

Under federal habeas review, "a state-court decision rejecting a sufficiency challenge may not be

overturned . . . unless the 'decision was objectively unreasonable.'" *Parker v. Matthews*, 567

U.S. 37, 43 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (internal

quotation marks omitted)). The effect is to make the federal court's review "twice-deferential."

*Id.*[5] Thus, "[t]he habeas question of whether the state court decision is objectively unreasonable

is layered on top of the underlying standard governing the constitutional right asserted." *Hurtado*

*v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001); *see also Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir.

2014) ("In other words, we do not ask, as we might on direct review of a conviction in federal

court, whether the evidence was constitutionally sufficient. We ask, instead, whether the state

---

identical" to the standard promulgated by the U.S. Supreme Court in *Jackson*, 443
U.S. at 319, 99 S.Ct. 2781. *Logan v. Gelb*, 790 F.3d 65, 71 (1st Cir. 2015). Thus,
"we can securely reason that in scouring the record for *Latimore* error and finding
none the SJC effectively answered the federal constitutional question." *Housen v.
Gelb*, 744 F.3d 221, 225 (1st Cir. 2014) (quoting *Leftwich*, 532 F.3d at 24).

*Roman v. Mitchell*, 924 F.3d 3, 6 n.1 (1st Cir. 2019).

[5] Petitioner also invokes 28 U.S.C. § 2254(d)(2), "which allows habeas corpus relief if there was
an unreasonable determination of the facts in light of the evidence presented in the state court
proceedings." Docket No. 15, at 13. In this case, however, the SJC did not make any factual
determinations; it conducted a conventional appellate review, in which it considered the
sufficiency of the trial evidence to support the jury's verdict.

courts' ruling that the evidence is constitutionally sufficient was itself 'unreasonable.'" (quoting 28 U.S.C. § 2254(d)(1))).

Of course, deferential review nonetheless requires careful consideration of the record evidence and of the inferences that can be reasonably drawn from that evidence. Although the *Jackson* "standard exhibits great respect for the jury's verdict, an inquiring court must nonetheless avoid 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Magraw*, 743 F.3d at 4 (quoting *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir. 1995)). Accordingly, I review the trial evidence in some detail.

In reviewing the trial evidence, I note that important parts of the Commonwealth's proof at trial rested on problematic witnesses and upon circumstantial evidence. For a reviewing court considering the sufficiency of evidence, however, such issues matter little. It was for the trial jury to weigh witness credibility issues such as inconsistencies between various witnesses' accounts, inconsistencies in witnesses' own accounts at different times, witness bias, and questions about witnesses' ability to perceive or recall information. Whether in state or federal court, such matters are entrusted to the factfinder. "[S]ifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province, not ours." *United States v. Soler-Montalvo*, 44 F.4th 1, 10 (1st Cir. 2022) (quoting *United States v. Cruz-Ramos*, 987 F.3d 27, 38 (1st Cir. 2021) (cleaned up)). "[A] jury can freely choose to credit particular testimony while discounting other testimony that arguably points in a different direction." *United States v. O'Brien*, 14 F.3d 703, 707 (1st Cir. 1994).

### B. *Evidence at Trial and Inferences from that Evidence*

In hearing oral argument in this case, my questions to counsel reflected that I initially had some difficulty identifying the chain of inferences which could support the kidnapping component of the verdict in the case. In part, my difficulty stemmed from the way the SJC

decision was written. It is evident that the Justices of the SJC did not deem the sufficiency issue a particularly close one. Accordingly, they did not have occasion to focus microscopically on the particular aspects of sufficiency (kidnapping and use of firearm) that Petitioner has now isolated for habeas review in this Court. The SJC's opinion addressed a broad array of claims of substantive and evidentiary error and is organized to put those evidentiary issues into sharp relief. The SJC's opinion does not segregate its review of the evidence supporting the inference that Harkins was kidnapped from its discussion of the various evidentiary issues that were raised before the SJC.

Given the narrowed issues raised by the habeas petition, I have found it useful to review and restate the trial evidence with a close focus on the direct evidence and attendant inferences that support the jury's verdict. To focus specifically on the kidnapping and firearms issues, I have arranged my recitation of facts in a different order than the SJC's opinion.

1.   *Direct Evidence*

Before delving into the inferences that might reasonably be drawn from the evidence, I begin by reciting facts that are supported by direct evidence at trial (*i.e.*, witness testimony and exhibits). Resolving all contradictions in favor of the verdict,[6] there was direct evidence from which the jury could have found the following facts:

---

[6] At trial, Petitioner presented testimony from witnesses who contradicted the Commonwealth's witnesses on various topics, including such varied points as: Harkins's demeanor on the evening of his disappearance, the color of the car that Trotto entered, and the direction in which the car drove away. In addition, various of the Commonwealth's witnesses were confronted in cross-examination with prior statements that were, in varying degrees, inconsistent with their trial testimony. The Court is required to assume, in the posture of a sufficiency-of-the-evidence challenge, that the jury credited those witnesses whose testimony supported the verdict. *See United States v. Lara*, 181 F.3d 183, 204 (1st Cir. 1999) ("The jurors were entitled to choose which witnesses to credit, and, in the posture of a sufficiency-of-the-evidence challenge, we must assume that they credited those witnesses whose testimony lent support to the verdict.").

- Harkins was a resident of Worcester, who had scarcely ever traveled out of Worcester, with ongoing family connections and strong ties to the community. *See* Docket No. 10-9, at 188; Docket No. 10-10, at 63.

- Harkins worked as a bouncer at Suney's Pub and Family Restaurant in Worcester. Docket No. 10-11, at 156.

- Harkins lived in a fourth floor apartment in the same building. *See id.* at 62, 156.

- Harkins was known in the community as a "tough kid," a former boxer who was not afraid of anyone in hand-to-hand combat. Docket No. 10-10, at 48; Docket No. 10-11, at 126, 128.

- Harkins was a heavy cocaine user. Docket No. 10-9, at 193; Docket No. 10-11, at 65, 156.

- Harkins was also an occasional cocaine seller. Docket No. 10-13, at 192.

- Harkins frequently bought cocaine from Trotto, ordinarily in small quantities. Docket No. 10-11, at 41, 67–69.

- On multiple occasions, Trotto met Harkins at Suney's to sell him cocaine. *Id.* at 67–69.

- On such occasions, Trotto sometimes stepped into Suney's and summoned Harkins outside the bar, where a cocaine sale would be consummated. Docket No. 10-13, at 190–92.

- Trotto was particularly close to two associates, John Fredette and Elias Samia, each of whom Trotto described as his "brother." Docket No. 10-10, at 21; Docket No. 10-12, at 15.

- Samia was known routinely to carry a firearm. Docket No. 10-12, at 17.

- On September 3, 1993, Fredette was arrested and charged with cocaine dealing. Docket No. 10-11, at 37–38, 48–49.

- Also arrested on that date was Robert Beahn, nickname "Rabbit," a friend of Harkins who was a denizen of Suney's and who, like Harkins, lived upstairs from the bar. *Id.*

- Beahn was released on bail shortly after his arrest. *Id.* at 39.

- Later that day, in Harkins's presence, Trotto approached Beahn in Suney's. Trotto wrapped a sweatpants drawstring (which Beahn had been carrying) around Beahn's neck and choked him with it, telling Beahn "If you said anything, I find out you did anything, you're going to regret it." *Id.* at 43–44.

- On another occasion, Beahn saw Trotto enter Suney's and meet with Harkins. Afterwards Harkins told Beahn that Trotto believed Beahn had caused Fredette's legal problem and that Trotto intended to kill Beahn. *Id.* at 46–47.

- On another occasion, Samia displayed a firearm in the Buona Fortuna pub, in Harkins's presence. Later that day, Trotto reinforced his threat against Beahn, in Harkins's and Beahn's presence, by brandishing Samia's pistol outside the Buona Fortuna pub, while commenting that he (Trotto) was "going Rabbit hunting." *Id.* at 127.

- At some point after Fredette's and Beahn's drug arrests, Trotto enlisted Harkins in a scheme to derail the case against Fredette.

- The initial plan was for Harkins to pay a $50,000 bribe to a Worcester police officer, Timothy O'Connor. O'Connor was a long-time friend of Harkins who sometimes worked alongside Harkins, overseeing security at Suney's. That initial bribery attempt failed, as did a follow-up attempt that added a pick-up truck to the bribe. *Id.* at 157–59, 167–68.

- As Fredette's trial grew nearer, Trotto concocted a different scheme to derail the case against Fredette, namely, for Harkins to appear in court and testify falsely on Fredette's behalf. *Id.* at 69–72.

- Although the precise contours of the plan are vague, one version was for Harkins to offer testimony that he had been the informant who set up Fredette and that he had lied in doing so. *Id.*

- By December 1993 or early January 1994, Harkins understood that, if he testified as Trotto demanded, he would go to prison and would be considered a "rat" in prison. Harkins, however, was afraid—to the point of tears—that Trotto would kill him unless he appeared and testified as planned. *Id.* at 130–31.

- On Friday, February 11, 1994, with Fredette's trial scheduled for the upcoming Monday, Trotto and Fredette met with Harkins at Harkins's apartment to make sure Harkins knew what he was supposed to say in court. *Id.* at 69–72.

- Trotto sealed Harkins's commitment to follow through on the false testimony scheme by giving Harkins a substantial quantity of cocaine (approximately one ounce). *Id.* at 72–74.

- This was considerably more cocaine than Harkins could typically afford. *See id.* at 74.

- Harkins understood that by accepting the cocaine from Trotto, Harkins was sealing his obligation to appear. *See id.*

- Harkins used up all the cocaine over the course of the weekend. *Id.* at 74–75.

- Harkins did not show up at Fredette's scheduled trial on Monday, February 14, 1994. *Id.* at 75.

- On Monday, February 14, 1994, Fredette pled guilty and was sentenced to a term of 4 to 6 years in prison. *Id.* at 55.

- Fredette was allowed a four-day stay to get his affairs in order before he was required to report to prison. Docket No. 10, at 205 (Fredette's docket sheet indicates that his sentence was stayed until February 18, 1994); *see* Docket No. 10-15, at 44 (noting Fredette's docket sheet as "Exhibit 22" in the trial).

- The next day, on the evening of February 15, 1994, Harkins was in Suney's. He was not on duty as a bouncer that evening, but was there as a patron, drinking at the bar and walking to the pinball machine to play pinball. Docket No. 10-10, at 55–56.

- Harkins demeanor on that evening was unusual; instead of his usual "happy-go-lucky" attitude, he seemed anxious and was constantly looking around nervously. *Id.* at 59.

- At approximately 10:30 pm, Trotto opened the front door of the bar and beckoned for Harkins to come outside. *Id.* at 59–60.

- Harkins left his keys, cigarettes, and jacket at the bar, along with an unfinished beer, and stepped outside. *Id.* at 62.

- Once outside, Trotto escorted Harkins to the door of a waiting car, with Trotto walking approximately 6 inches behind Harkins. Docket No. 10-11, at 77–78.

- The car was a 1985 Chevrolet Impala, registered to Elias Samia. The Impala was black, although its original paint color was blue. Docket No. 10-12, at 50–52; Docket No. 10-13, at 83–84.

- Inside the car were Fredette and Samia, one of whom was in the back seat. Docket No. 10-11, at 82; Docket No. 10-13, at 171.

- Harkins started to enter the back door on the passenger side of the car, but Trotto guided him to the front door (passenger side) and entered by the same door (leaving Harkins sandwiched between Trotto and the driver). Docket No. 10-11, at 77–79.

- Harkins was driven away from Suney's. *Id.* at 79.

- Sometime before 2 a.m. on February 16, 1994, Trotto shot and killed Harkins while they were in the car. Docket No. 10-13, at 11, 82–83.

- Trotto later characterized the shooting to an acquaintance, Anthony Carlo, as "accidental[]."[7] *Id.*

---

[7] As discussed below, the evidence about what Trotto said to Carlo was fragmentary. It is unclear whether the characterization of the shooting as "accidental" meant that Trotto had not intended to

*Footnote continues on following page.*

- One or more of Trotto, Fredette, and Samia disposed of Harkins's body. *Id.* at 84–85.

- Around 2 a.m., about three miles south of Worcester, a patrol officer from the adjacent town of Millbury pulled over Samia's Impala, which was travelling about 10 miles per hour above the speed limit. Docket No. 10-12, at 39–40.

- At the time of the traffic stop, the car was driving north (*i.e.*, toward Worcester). *Id.* at 42–43.

- At the time of the stop, only Samia and Fredette were in the car. Samia was driving. *Id.* at 52–55.

- Following a prolonged conversation with Samia, the officer searched the passenger compartment of the Impala. *Id.* at 54–55, 57–58.

- Samia told the officer that he did not have a key to access the trunk or glove box, and the officer did not search those areas. *Id.* at 58.

- Samia provided his driver's license but told the officer that he did not have his registration. Samia claimed he had given the registration to his insurance company when the car was repainted. *Id.* at 52–53.

- The officer noticed wet blood in the front passenger seat, on the floor in front of that seat, on the driver's side door, and on the back of Fredette's jacket. *Id.* at 58, 60–61.

- When asked about the blood, Fredette told an officer at the scene of the traffic stop that he had been punched in the face in a bar fight earlier in the evening. There was, however, no sign that Fredette had been injured. *Id.* at 62.

- Ultimately, the officer permitted Samia and Fredette to leave, and they drove away in the Impala. *Id.* at 64.

- A few hours later, at 5:30 am., a mechanic who worked at Ace Auto Sales got a phone call summoning him to work. Docket No. 10-11, at 17.

- The call was from the owner of Ace Auto Sales, which is an automobile sales, repair, and salvage shop. *Id.* at 12–13, 17.

- When the mechanic arrived around 6:15 a.m., Samia's Impala was parked outside the shop. The mechanic was acquainted with both Trotto and Samia and had previously worked on Samia's Impala. *Id.* at 15–18.

---

shoot Harkins at all, or whether he had planned to shoot Harkins, but did not intend to do it in the car.

- About 20 minutes later, Trotto arrived and went into the office of Ace Auto Sales and spoke with the shop owner. *Id.* at 19.

- When Trotto left the office, he drove the Impala into one of the service bays. *Id.*

- Trotto then told the mechanic that he had to help get rid of the Impala, that it could not be found, and that the mechanic had to "keep [his] mouth shut or [he] or [his] family would never be safe."  *Id.* at 19–20.

- Trotto stayed for about 20 minutes, watching the mechanic start demolishing the Impala. *Id.* at 21.

- The mechanic, with assistance of another, dismantled the Impala. These efforts included bringing the car to a different auto shop where they could cut up some of the larger pieces with a cutting torch. *Id.* at 22–23.

- The mechanic, with the assistance of others, disposed of the pieces of the Impala at various locations in the Worcester area. *Id.* at 24–26.

- One piece, which police salvage divers later found in a nearby pond, was a door that was identifiable by model and make, and by the distinctive black paint over the original blue finish. Docket No. 10-12, at 73–100; Docket No. 10-13, at 102–23.

- Harkins was never seen again after February 15, 1994. Docket No. 10-9, at 191; Docket No. 10-11, at 55–56, 166; Docket No. 10-13, at 194.

> 2.    *Inferences Regarding Harkins's State of Mind*

Because there was no evidence to suggest that Harkins was physically forced into the Impala, the Commonwealth's theory of the case depended on an inference that Harkins was induced, by constructive force, to get into (or thereafter to remain in) the Impala with Trotto and his associates. *See* Docket No. 10-9, at 92–93 ("[W]e must prove that the victim got into that car against his will or was – and/or was detained there in that car against his will, even if he got in there voluntarily in the first place.").[8]

---

[8] The trial judge instructed the jury as to the contested elements, as follows:

> The second element the Commonwealth must prove beyond a reasonable doubt is that the defendant forcibly or secretly confined or imprisoned the alleged victim in Massachusetts. The word "forcibly" means carried out through the use of force.

> *Footnote continues on following page.*

In its closing argument, the prosecution contended that Harkins may have willingly stepped outside the bar to talk with Trotto, but that Harkins "wouldn't have gotten in that car willingly" and that "he would not have stayed in that car and [been] driven down Chandler Street and taken away from the front of Suney's if he had a choice." Docket No. 10-15, at 100.

From the direct evidence discussed above, a reasonable finder of fact could draw the following inferences about Harkins's state of mind:

- On February 15, 1994, Harkins was afraid of being killed by Trotto.

- Harkins's fear of Trotto was based on Trotto's expressed willingness to kill any person (initially expressed toward Beahn) whom Trotto deemed responsible for his "brother" Fredette going to prison.

- Harkins understood that Trotto expected him to help clear Fredette.

- Harkins's fear was specifically rooted in Harkins's understanding that Trotto expected Harkins to take the fall for Fredette, even if it meant being treated as a "rat" in prison.

- Harkins understood that he had no choice but to appear and testify as Trotto demanded, or else he would be killed.

---

One acts "forcibly" toward another if one compels, constrains or obliges him or her to do something against his or her will. Force may be either actual or constructive, so there need not be actual physical force applied against the alleged victim. It is sufficient that the alleged victim is subdued by a display of potential force.

"Secretly" means to do something without the knowledge of others.

"Confine" means to enclose within bounds or to limit, restrict, shut out or keep in.

"Imprison" means to detain in custody or to hold in restraint. Any restraint of a person's liberty is a confinement or an imprisonment.

The third element the Commonwealth must prove beyond a reasonable doubt is that the defendant committed the offense against the person's will. "Against his or her will" means that the alleged victim did not consent to be seized, confined, imprisoned, carried, sent, inveigled or kidnapped by the defendant. A person's submitting because of fear is not consent.

Docket No. 10-15, at 135–36.

- Harkins understood that, by accepting "free" cocaine from Trotto, he had sealed his commitment to testify as Trotto demanded.

- Harkins had failed to show up for Fredette's trial date.

- When Trotto appeared at Suney's the following evening, Harkins understood that he was in great danger from Trotto and his associates, due to Harkins's failure to show up for Fredette's trial.

       3.     *Inferences Supporting Finding of Kidnapping with Use of a Firearm*

Going beyond the direct evidence, a rational jury could draw the following inferences:

- When Harkins stepped out of Suney's, he had no intention to travel anywhere or even to spend much time outside.

This is inferable from the fact that Harkin left his jacket,[9] cigarettes,[10] and keys at the bar, along with an unfinished beer.

- When Harkins stepped outside Suney's he would have seen the Impala and would have seen that Fredette and Samia were in the Impala.

This is inferable from: (a) the testimony of Timothy Mayotte, who reported that he saw, from his fourth-floor apartment window, a "[d]ark sedan" pull up to Suney's, with Fredette driving and another person (whom Mayotte could not identify) in the back seat (Mayotte also reported that he saw Trotto get out of the car and enter Suney's) (*see* Docket No. 10-11, at 77); and (b) the 2012 grand jury testimony of Anthony Carlo, recounting Trotto's admission that he was in the Impala with Samia and Fredette (*see* Docket No. 10-13, at 80–82). Assuming the jurors credited Mayotte's testimony, they could readily have concluded that what was visible to Mayotte was also visible to Harkins. Even without Mayotte's testimony, a reasonable finder of fact could infer that a person approaching a stopped car would see who was inside.

---

[9] A witness recalled that it was a relatively mild night for February, stating that "[i]t was probably in the low 40s." Docket No. 10-10, at 58.

[10] Harkins was described as a "chain smoker." Docket No. 10-11, at 65.

- Harkins understood and feared that Trotto, or Samia or Fredette, were armed.

The jury had heard that Harkins was a boxer who was unafraid of anyone in hand-to-hand combat, but that Harkins was notably anxious on the night he disappeared. Thus, they could reasonably have concluded that Harkins feared something more than fisticuffs. In addition, the jury heard that Samia ordinarily carried a handgun, that Harkins had seen Samia display it, and that Harkins had been present when Trotto had brandished Samia's pistol to underscore Trotto's threat to kill Beahn. As the prosecution argued, "[h]e is escorted across the street, and that's exactly right. He is not getting in that car as a fighter unless he is afraid of what Matteo Trotto has." Docket No. 10-15, at 96. Finally, from Carlo's testimony that Trotto admitted he was holding a pistol when it discharged and killed Harkins, the jury could reasonably infer that Trotto himself brandished a pistol during the episode—either in escorting Harkins to the front door of the Impala (when Trotto was seen from a distance walking approximately 6 inches behind Harkins), or at a time when Harkins was confined in the Impala.[11]

- Harkins did not enter the Impala voluntarily, or did not voluntarily remain in the Impala, on the night in question.

This, the ultimate necessary inference to support the predicate kidnapping offense, follows reasonably from the previous inferences.

---

[11] There was testimony that Harkins initially started to enter the back seat of the Impala but that Trotto directed him instead to the front door. I am hard-pressed to see what reasonable inferences can be drawn from this testimony as to whether Harkins was acting under duress. Although it is consistent with an interpretation that Trotto was directing Harkins's movements, it has scant probative force; a person voluntarily entering a car might, in the ordinary course, be directed to one seat or another. At trial, the prosecutor acknowledged as much. *See* Docket No. 10-15, at 96 ("It doesn't matter whether he gets in the front seat or the back seat. He's not getting in because he is boxed in. He is getting in that car, the evidence shows, because he is afraid.").

C.      *Petitioner Invites the Court to Re-Weigh the Trial Evidence*

In attacking the SJC's determination that there was sufficient evidence to support a finding of kidnapping, Petitioner contends that the SJC viewed the evidence too narrowly and thereby reached "unreasonable determinations of fact in light of the evidence presented under §2254(d)(2)." Docket No. 15, at 18. Of course, the SJC was not the factfinder here; the SJC simply reviewed the sufficiency of the evidence to support the trial jury's verdict. Juries have considerable latitude in weighing circumstantial evidence, subject to the "any rational trier of fact" *Jackson* standard.

The task of the primary reviewing court (*i.e.* the SJC) was to determine whether circumstantial evidence as to an essential element of an offense was sufficient to permit a rational finder of fact to find that such element was proven beyond a reasonable doubt. For the federal court, the task is to consider whether any reasonable jurist could have concluded, as the SJC did, that the evidence was sufficient as to each necessary element. *See generally Magraw*, 743 F.3d at 6 (noting that "direct evidence is not necessary to sustain a conviction" and that "[t]his principle is even more firmly established in connection with the deferential approach to state-court decisionmaking that federal habeas review demands").

Petitioner contends that the jury went too far—that its conclusions outstripped the reasonable inferences that might be drawn from the evidence and that the SJC erred in sustaining the jury's verdict.

The heart of Petitioner's argument is his contention that the SJC focused exclusively on the evidence that supported his conviction. He contends that the SJC should instead have considered that the Commonwealth's witnesses were impeached in a variety of ways. Petitioner points out that: some witnesses' accounts of the events in question had shifted over time (*see, e.g.*, Docket No. 15, at 6 n.9), some witnesses had been influenced by news reports (*see, e.g.*, *id.*

at 10), and some witnesses had limited opportunity to perceive the events they described (*see,*
*e.g.*, *id.* at 6). Moreover, various witnesses' accounts were contradictory, in greater and lesser
degree—even among the Commonwealth's own witnesses. *See, e.g.*, *id.* at 6 n.8, 6 n.9, 8.
Petitioner also emphasizes that the SJC, in its decision, did not discuss the testimony of defense
witnesses who offered sharply differing accounts of the events in question. *See id.* at 21, 27–28
(citing testimony of witnesses who said they did not notice anything unusual in Harkins's
demeanor on the evening of February 15, 1994).

In effect, Petitioner argues that this Court, on habeas review, should re-weigh the
evidence as a whole. This is particularly so, Petitioner suggests, because the SJC's opinion does
not mention some of the witnesses whose testimony Petitioner identifies as helpful to his cause.
*See, e.g.*, Docket No. 15, at 27 ("The larger evidentiary record, neither acknowledged or
discussed by the state court in its analysis, establishes that multiple witnesses observed Harkins
on the evening he left Suney's."). Petitioner contends that the SJC was unreasonable in focusing
on evidence that tends to support the verdict and that this amounted to "an extremely partial, and
thereby inaccurate, view of evidence that ignores the larger evidentiary record." *Id.* at 18.

Petitioner cites three cases in support of his suggestion that the federal court, on habeas
review, should re-evaluate the evidence in toto. *See id.* at 19. Specifically, Petitioner cites *Miller-*
*El v. Cockrell*, 537 U.S. 322 (2003); *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005); and *Taylor*
*v. Maddox*, 366 F.3d 992 (9th Cir. 2004). *See id.* For each of these citations, Petitioner includes
quotations that, at first blush, seem to support his argument. Upon review of the cited decisions,
however, none of them remotely supports Petitioner's position. Indeed, none of the cited cases
concerned *jury* verdicts; they all involved factfinding by state courts about procedural issues with
direct constitutional implications. *Miller-El*, for example, concerned evidence of racial bias in

connection with a *Batson*-based claim of jury selection misconduct. *See* 537 U.S. at 346 ("Our concerns are amplified by the fact that the state [trial] court also had before it, *and apparently ignored*, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past." (emphasis added)). *Guidry* and *Taylor* concerned judge-made factual findings about the voluntariness and reliability of confessions. *See Guidry*, 397 F.3d at 325–26; *Taylor*, 366 F.3d at 1004–05.

Petitioner's citation of these irrelevant cases does nothing to shift the well-established standards that govern this matter. "On review for evidentiary sufficiency, . . . 'a habeas court may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict.'" *Housen v. Gelb*, 744 F.3d 221, 226 (1st Cir. 2014) (quoting *Magraw,* 743 F.3d at 7).

Petitioner suggests the SJC's decision was "unreasonable" as a matter of law because the SJC's opinion recites only evidence that favored the prosecution and does not discuss with particularity the witness testimony that favored Petitioner's case. But the SJC was not required to write about every item of evidence, nor to weigh the evidence that might have favored Petitioner. Petitioner's contentions collide headlong with the fundamental principle that, on habeas review, the federal court is not called upon to critique a state court's opinion writing, but rather to consider "whether the outcome is reasonable." *Hurtado*, 245 F.3d at 20. Even summary decisions without opinion are subject to this standard. *Cf. Harrington v. Richter*, 562 U.S. 86, 99 (2011) (noting that "[o]pinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court").

Petitioner offers, in short, no support for his suggestion that the SJC erred in focusing on the evidence that supported the conviction or that the SJC erred by disregarding contrary evidence or inferences. Indeed, Petitioner's suggestion is unsupportable; as the SJC pointed out, its task was to "recite the facts the jury could have found, viewing them in the light most favorable to the Commonwealth." *Trotto*, 487 Mass. at 711. Still less does Petitioner advance any cogent argument that the SJC's determination on sufficiency was "'contrary to' or an 'unreasonable application of' clearly established federal law, as determined by the decisions of the Supreme Court." *Davenport*, 596 U.S. at 127 (quoting 28 U.S.C. § 2254(d)).

### D.   *Petitioner's Challenges to Specific Inferences*

Along with his arguments aimed at persuading the court to re-weigh the evidence as a whole, Petitioner challenges several particular inferences that might be drawn from the evidence.

#### 1.   *Whether Harkins Voluntarily Left the Bar*

In conjunction with his invitation to re-weigh the kidnapping evidence in the case, Petitioner attempts to recast the factual issue that was put to the jury by focusing on Harkins's decision to walk outside when Trotto beckoned him. As Petitioner frames it:

> The observations of everyone present when Harkins departed undermine the state court's determination that Trotto used "threatening words or gestures" to get Harkins into the vehicle. According to the trial testimony, Mr. Trotto simply motioned for Harkins and then Harkins walked out of a public establishment of his own volition, independently, in a voluntary manner, for all to see. There was no coercion of any kind. The evidence establishes that Harkins walked across the street and right up to the vehicle to get in, consistent with a prior plan. There is no evidence of words spoken, disagreement, threats, hesitation, or a weapon.

Docket No. 15, at 21.

This is a red herring. Petitioner is correct that the evidence tends to show that Harkins voluntarily stepped out of Suney's when Trotto beckoned to him. But the Commonwealth did not suggest anything different. On the contrary, the Commonwealth expressly argued that while

Harkins stepped out of the bar voluntarily, his actions, in leaving his keys, cigarettes, and jacket at the bar, reflected that he had no intention of going far, let alone of getting into a car with Trotto and his associates. The Commonwealth argued—based on the evidence that Harkins was afraid Trotto would kill him—not that Harkins was coerced to step outside the bar, but that he was coerced when he got in the car:

> Now, he can't run and hide from Matteo Trotto if he is staying in Worcester, so stepping out of that bar makes sense. But going across that street and getting in that car with John Fredette and Elias Samia makes no sense. And that's where you know, based on all the evidence, he wouldn't have gotten in that car willingly.

Docket No. 10-15, at 99.

### 2. *Evidence of Coercion and Threat of Deadly Force*

Petitioner challenges the reasonableness of the SJC's finding that there was sufficient evidence to support an inference that Trotto used a threat of force to kidnap Harkins. In the same vein, he also challenges the SJC's conclusion that the evidence was sufficient to support the jury's "finding that the manner in which the kidnapping occurred showed a conscious disregard for the risk to human life." *Trotto*, 487 Mass. at 717. A core inference on which both sufficiency determinations rested was that the jury could properly find that Trotto "either was armed himself" when the kidnapping occurred, "or at least knew that one of his coventurers . . . was armed." *Id.* at 718.

Petitioner repeatedly asserts that there is no evidence of a weapon being used in the kidnapping. *See, e.g.*, Docket No. 15, at 21 ("There is no evidence of words spoken, disagreement, threats, hesitation, or a weapon."), 22 ("There is no evidence. . . . [that] Trotto had a weapon, displayed a weapon, commented about a weapon, or that Harkins was aware of a weapon."), 28 ("There is no evidence that a weapon was used."), 36 ("There is no evidence whatsoever that Mr. Trotto used a weapon to kidnap Harkins from Suney's Pub.").

22

The record, however, contradicts Petitioner's assertions. It is true that no eyewitness reported seeing a gun in Trotto's hand on the night of Harkins's disappearance. But there was indeed evidence about a weapon. Petitioner's repeated assertions to the contrary ignore that the jury heard evidence that Trotto had admitted (to Carlo) that he was holding a gun and had "accidentally" shot Harkins in the Impala. It was well within the jury's province to infer from this description of the shooting that Trotto or his associates had the gun when they came for Harkins, and that Trotto knew it.[12] As the SJC noted:

> Although Moore testified that he found no gun in the Impala, according to Carlo, the defendant said that there had been one, which "went off accidentally while he was holding it," killing the victim. There also was testimony that Samia carried a gun "most of the time." From this, the jury reasonably could have concluded that the defendant either was armed himself or at least knew that one of his coventurers, sitting in the vehicle in which he was confining the victim, was armed. This would be sufficient to establish that the kidnapping involved a conscious disregard of the risk to human life.

*Trotto*, 487 Mass. at 717–18.

In a similar vein, Petitioner dismisses the Commonwealth's evidence about Harkins's fear of Trotto as "alleged statements of fear made by Harkins to third persons at other places and times." Docket No. 15, at 21. This may have been a workable argument to the jury, but the SJC was required to consider the evidence in the light most congenial to the verdict, and this Court

---

[12] While Carlo's grand jury testimony was fragmentary, it was for the jury to determine whether to credit it. Petitioner repeatedly characterizes Carlo's statement as "uncorroborated." *E.g.,* Docket No. 15, at 22, 38. This is incorrect. There was evidence from multiple sources that a reasonable finder of fact could consider as powerfully corroborating, albeit indirectly, the story of a bloody misadventure in the Impala. There was the testimony of the police officer who stopped the Impala and saw wet blood on the front seat and floor around 2 a.m. And there was detailed testimony about how, eight hours after Harkins's disappearance, Trotto arranged to have the Impala chopped into pieces to be scattered at numerous separate locations, along with testimony about how Trotto had demanded the mechanic's silence, on pain of death. The mechanic's testimony was corroborated by other witnesses, and by police divers' recovery of the car's door, which was identifiable by year, make, and model, and by the overpainting of black atop the original blue finish.

must do the same, with an added degree of deference based on the AEDPA "twice-deferential" standard. There was ample evidence to support a jury finding that Harkins feared for his life after he failed to show up for Fredette's trial.

Finally, in asking the Court to consider piecemeal the various instances when Harkins expressed fear of being killed by Trotto unless he helped clear Fredette, Petitioner elides a critical circumstance, which is the timing of Harkins's disappearance. The evidence was that Trotto, Samia, and Fredette came for Harkins one day after Harkins had failed to show up for Fredette's trial. These circumstances, considered together, supported an inference that Harkins's fears were immediate and urgent.

> 3.    *Motive Evidence*

Petitioner is on somewhat firmer ground in pointing out weaknesses in the Commonwealth's evidence about Trotto's motivation to kidnap Harkins. It is readily understandable that Trotto would have turned on Beahn, either out of suspicion that Beahn had set up Fredette for the drug bust, or out of concern that Beahn might consider striking a deal with prosecutors to testify against Fredette. Although there was evidence that Beahn and Harkins were friends, there was a dearth of evidence to explain how Trotto came to focus his attention on Harkins.[13] The evidence about the bribery plot was fragmentary and somewhat convoluted, as was the evidence about how that scheme morphed into a plan for Harkins to testify on Fredette's behalf. As Petitioner points out, it seems farfetched to suppose that Harkins would have been able to paint a testimonial picture so effective as to derail the case against Fredette. Fredette,

---

[13] This lacuna is not necessarily surprising; the person who would have been expected to know these things was Harkins.

after all, had been caught red-handed, in possession of distribution-level quantities of cocaine. Docket No. 15, at 4 n.6.

Unfortunately for Petitioner, the murkiness surrounding Trotto's alleged motive does little to advance his habeas petition. Evidence of motive may be helpful in persuading a jury of guilt, but motive is not an element of any offense charged against Trotto. Weaknesses in the Commonwealth's explanation about the genesis of Harkins's fears do not provide a basis for concluding that the SJC's sufficiency findings were unreasonable. *Cf. Roman v. Ryan*, No. 16-CV-10116-ADB, 2018 WL 9610790, at *6 n.4 (D. Mass. Sept. 12, 2018), *aff'd sub nom. Roman v. Mitchell*, 924 F.3d 3 (1st Cir. 2019) ("Because motive is not an element of the crime of deliberately premeditated murder, the absence of such evidence is insufficient to undermine the SJC's sufficiency determinations in light of the evidence that was presented."). Whatever may have been the details of Trotto's and Harkins's interactions, there was ample evidence from which a jury could infer that Harkins believed Trotto intended to kill him.

### 4.     *Petitioner's Sufficiency Cases*

Petitioner cites an array of opinions, some from Massachusetts, most from a variety of other jurisdictions, in which courts found trial evidence either sufficient or insufficient to support kidnapping charges. *See* Docket No. 15, at 30–34. Each of the scenarios described in these reported decisions is *sui generis*, and none is particularly instructive here. Critically, not one of the cited cases sheds any light – one way or the other – on the sufficiency of the evidence to support the key inference upon which the Commonwealth's kidnapping evidence rested: that Harkins's fear of being killed by Trotto and his associates was such that a jury could infer that Harkins did not voluntarily get into, or remain in, the Impala. Indeed, none of the cases the Petitioner cites touches upon circumstances in which a kidnapping victim acts out of fear of being harmed by someone who, the victim believes, is coming to kill them.

25

Petitioner cites several Massachusetts kidnapping cases in which the evidence of coercion focused on direct physical assaults; these are plainly inapposite. *See* Docket No. 15 at 31 (citing *Commonwealth v. Oberle*, 476 Mass. 539 (2017), *Commonwealth v. Brown*, 66 Mass. App. Ct. 237 (2006), *Commonwealth v. Lent*, 46 Mass. App. Ct. 705 (1999), and *Commonwealth v. Titus*, 32 Mass. App. Ct. 216 (1992)). And Petitioner cites two Massachusetts insufficiency cases that involved charged *attempted kidnapping*, in which the alleged victims did not get into vehicles. Docket No. 15, at 30–31 (citing *Commonwealth v. Rivera*, 460 Mass. 139 (2011); and *Commonwealth v. Banfill*, 413 Mass. 1002 (1992)). These cases merely support the proposition that simply *telling* a person (even a youngster) to get into a car does not constitute a kidnapping attempt.

Nor is it much help to compare this case to cases of coercion and constructive force in which the victims were available to testify about the circumstances of their confinement. *See* Docket No. 15, at 32 (citing *Commonwealth v. Caracciola*, 409 Mass. 648 (1991) (victim testified about abduction and rape by defendant who impersonated a police officer); and *Commonwealth v. Boyd*, 73 Mass. App. Ct. 190 (2008) (confinement and rape by co-habiting partner where victim recounted statement that "[s]omeone is going to die")). In short, the Massachusetts cases that Petitioner cites do nothing to illuminate Petitioner's contention that the SJC was unreasonable in ruling that a rational finder of fact could infer that Harkins was coerced into getting in the Impala.

Nor is there much value in cherry-picking isolated bits of language from one or another kidnapping case from around the country. Petitioner cites, for example, an unpublished case, *State v. Miller*, No. 88,854, 2004 WL 1191017 (Kan. Ct. App. May 21, 2004), for the proposition that evidence of kidnapping was insufficient "where the defendant 'merely motioned for [the

victim] to follow him outside [the bar].'" Docket No. 15, at 33 (quoting *Miller*, 2004 WL 1191017, at *3). Apart from the commonality that both cases involved someone voluntarily leaving a bar and subsequently getting into a car, there is no analytical link to the circumstances here. In *Miller*, there was no question that the victim who left the bar and entered the car did so voluntarily; the person who beckoned was her romantic partner. *See* 2004 WL 1191017, at *1–3. *Miller* teaches us nothing about the sufficiency of coercion evidence that rests on showing that a kidnapping victim feared being murdered by his alleged abductor.

The additional cases that Petitioner cites from various jurisdictions are equally unhelpful. *See* Docket No. 15, at 33–34 (collecting cases); *see also State v. Smith*, 185 S.E. 460, 460 (N.C. 1936) (no evidence that victim was aware that the defendants suspected the victim of having robbed them); *In re. C.A.G.*, 786 S.E.2d 434 (N.C. App. 2016) (no known motive for defendant to harm the victim); *State v. Langley*, 705 N.W.2d 340 (Iowa Ct. App. 2005) (same); *Head v. United States*, 451 A.2d 615 (D.C. 1982) (same); *Clayton v. State*, 658 N.E.2d 82 (Ind. App. 1995) (defendant was a stranger to the victim); *State v. Robertson*, 531 S.E.2d 490  ((Ind. App. 2000) (same); *State v. Doss*, 2008 Ohio 449 (Ohio App. 2008) (same); *People v. Hill*, 3 P.3d 898 (Cal. 2000) (same); *Gaffney v. State*, 940 S.W.2d 682 (Tex. App. 1996) (same); *Chism v. State*, 853 S.W.2d 255 (Ark. 1993) (same); *State v. Jackson*, 305 S.E.2d 703 (N.C. 1983) (same); *Smothers v. United States*, 403 A.2d 306 (D.C. 1979) (same).

Because none of Petitioner's cases present closely analogous facts, there is no persuasive force in the mere observation that various state courts have reached differing conclusions when faced with differing circumstances.

E.      **The SJC's Decision on Sufficiency of the Evidence Was Reasonable as a Matter of Constitutional Law**

The question before the Court is *not* whether isolated points of commonality can be found with sundry kidnapping cases from other jurisdictions. The question is whether the SJC, in finding the evidence sufficient to sustain Petitioner's conviction, contravened the controlling authority from the Supreme Court, namely *Jackson*.

Taken together, the evidence reasonably supported the prosecution's theory that Harkins would not voluntarily have gotten into, and/or would not voluntarily have remained in, the Impala with Trotto, Samia, and Fredette. There was nothing inherently implausible in the prosecution's theory of the case. On the contrary, it is common sense that someone who believes he is about to be murdered would not voluntarily get into a car with the people he fears will kill him. This was sufficient to support an inference that Harkins was coerced by threat of force (*i.e.*, he was kidnapped). Likewise, the evidence supported a finding that a firearm was carried in the course of the kidnapping and that Trotto knew it. Under these circumstances, it cannot be said that the SJC adopted an unreasonable interpretation of federal constitutional law (as enunciated by the Supreme Court) in finding the evidence sufficient to support the jury's verdict that Trotto was guilty of felony murder beyond a reasonable doubt.

The mere fact that Petitioner can point to evidence that could have supported a different verdict makes no difference. As the Supreme Court has instructed, "a federal habeas corpus court faced with a record . . . that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326 (quoted in *Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016)).

Petitioner cannot demonstrate that "no fairminded jurist" would have reached the same result as the SJC in considering the sufficiency of the evidence. Thus, it cannot be said that the

SJC's decision rested upon an "unreasonable application of clearly established federal law" (*i.e.*, an improper application of *Jackson*), or that it reflected "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Accordingly, Petitioner's habeas challenge to the SJC's sufficiency ruling should be denied.[14]

## III.   Evaluation of Confrontation Clause Error as to Death Certificate and Database Searches

The SJC directly addressed Petitioner's claims that his Sixth Amendment confrontation rights were violated by the admission in evidence of a "delayed return of death" certificate and by the admission of testimony from a state police research analyst who described various database searches that had uncovered no record of any transactions after February 15, 1994, involving the victim. *See Trotto*, 487 Mass. at 728–33. In each instance, the SJC agreed with Petitioner that admission of the contested evidence had violated Petitioner's constitutional rights of confrontation. *See id.* at 729, 732 (citing *Commonwealth v. Middlemiss*, 465 Mass. 627 (2013) and *Michigan v. Bryant*, 562 U.S. 344 (2011)).

The SJC's opinion thoroughly described the improperly admitted evidence and analyzed the specific aspects that violated Petitioner's constitutional rights. Since neither party challenges the correctness of that analysis, I will not repeat it here.

Having found constitutional error in the trial evidence, the SJC proceeded to consider whether the prosecution had shown that the error, with respect to each item, was "harmless beyond a reasonable doubt." *Id.* at 730, 733. Neither party challenges that the SJC correctly

---

[14] Because Petitioner has not overcome the AEDPA threshold, there is no need to reach a *Brecht* analysis for the sufficiency challenge. *See Davenport*, 596 U.S. at 134, 138–39.

identified the applicable legal standard for direct review, following Massachusetts precedents that incorporate the standard enunciated in *Chapman v. California*, 386 U.S. 18, 21 (1967) (constitutional error must be harmless beyond a reasonable doubt).

The gist of Petitioner's claim is that in each instance, the SJC's findings amounted to an unreasonable application of the *Chapman* standard.

### A.    *Standard of Review*

There is no dispute here that the SJC ruled on the merits of Petitioner's claims regarding the death certificate and the database search testimony. Nor is there any dispute that the SJC identified the correct legal principles governing Petitioner's claim of constitutional error, both as to the violation of Petitioner's Sixth Amendment confrontation rights and as to the *Chapman* harmless-beyond-a-reasonable-doubt standard. Accordingly, habeas review on this issue is governed by the highly deferential standards set by AEDPA and the Supreme Court's decision in *Brecht.* "When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Davenport*, 596 U.S. at 122.

With respect to habeas review of a state court's *Chapman* analysis, *Davenport* provides explicit guidance:

> When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable. *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); *Fry*, 551 U.S., at 119, 127 S.Ct. 2321. To accomplish that, a petitioner must persuade a federal court that no "fairminded juris[t]" could reach the state court's conclusion under this Court's precedents. *Ayala*, 576 U.S., at 269, 135 S.Ct. 2187 (internal quotation marks omitted).

*Davenport*, 596 U.S. at 135.

In weighing whether any "fairminded jurist" could reach the result that the SJC did in this case, I note that, in *Davenport*, the Supreme Court described the *Chapman* standard as a general

rule. In this connection, the Court reiterated the principle that "'the more general the [federal] rule[,] . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations' before their decisions can be fairly labeled unreasonable." *Davenport*, 596 U.S. at 144 (quoting *Renico v. Lett*, 559 U.S. 766, 766 (2010) (alterations in original)).

### B.   *The SJC's Consideration of the Death Certificate and the Database Searches*

#### 1.   *The Death Certificate*

The SJC described the death certificate that was admitted in evidence as follows:

> The document in question is a certified copy, signed by the Worcester city clerk, of a certificate signed by the same clerk. Both the certificate and the copy are dated February 15, 2012; in the blank space to be filled in under "name and address of certifying physician or medical examiner" is a reference to a docket of the Worcester Division of the Probate and Family Court Department with a date of February 29, 2008. Under "date of death," the certificate states, "as of February 15, 2001." The record does not disclose anything about the circumstances of the certificate being issued or the probate proceeding that it references.

*Trotto*, 487 Mass. at 728–29.

On its face, the probative significance of the certificate was negligible. As the SJC noted, "[t]he certificate stated simply that the victim was dead 'as of February 15, 2001,' seven years after the date of his disappearance, and included no other information that corroborated the Commonwealth's case or implicated the defendant specifically." *Id.* at 730. Indeed, Petitioner's trial counsel highlighted the contrast between the contested certificate and conventional death certificates (some of which had been offered in evidence with respect to other deceased individuals), which reflect a date and cause of death. *See* Docket No. 10-15, at 70–73.

In particular, Petitioner's trial counsel pointed out that the contested certificate contained no information that would satisfy the Commonwealth's burden of proof:

> [PETITIONER'S COUNSEL]: Right here, ladies and gentlemen, Worcester Probate Family Court docket. Put down the date of the delayed death. Please bring that up for us.

[Exhibit published to the jury]

[PETITIONER'S COUNSEL]: 2001; as of 2001, as of, because they don't know. They don't know what happened to Kevin Harkins, and that's their burden. They have to show that Kevin Harkins was a homicide. They don't know. Nobody knows, ladies and gentlemen. Twenty years have gone by. Does that mean anything? Yeah, anything could have happened to him since then and now. But that's not proof beyond a reasonable doubt. That is not what the Commonwealth is responsible to show. Look at all the missing information: No cause of death, no funeral, no date of birth, no biographical information.

* * *

This should be renamed. This should be a missing person's certificate. And when they know more, then they can fill it in. Ladies and gentlemen, this is a missing person's certificate. It is issued by the probate court.

*Id.* at 72–73.

Notably, the prosecution's closing argument did not contradict Petitioner's counsel on this point and did not suggest that the certificate had any probative significance. Indeed, the prosecutor's sole mention of the document was an oblique comment that "it's not a piece of paper that shows you that Kevin Harkins was killed that night. It is all the other evidence." *Id.* at 101–02.

Given the other evidence at trial, the SJC's conclusion that the certificate did not contribute to the verdict is unassailable. As the SJC noted, "the circumstantial evidence of [Harkins's] death at trial was strong." *Trotto*, 487 Mass. at 730. The trial featured testimony from numerous friends and relatives who "testified uniformly that they had not seen or heard from the victim after February 15, 1994." *Id.*[15] And, the SJC noted, "[t]aken together, a sudden

---

[15] To be sure, there is a slip of the pen in the SJC's decision. Among the circumstantial evidence that the SJC cited is a mention that "the victim's name appeared in no public databases." *Trotto*, 487 Mass. at 730. Inasmuch as the next section of the SJC's opinion found error in the admission of testimony by a state police analyst regarding database searches (*id.* at 731–33), this reference is obviously inapt. The point, however, is a minor one.

disappearance, bloodstains, and a suspect's apparent attempts . . . to conceal the victim's disappearance, or evidence of the crime, are circumstantial evidence of an unlawful killing." *Id.* (citation and internal quotation omitted).

Beyond the circumstantial evidence cited by the SJC, the jury heard evidence that Trotto had admitted to Carlo that Harkins was shot, in the Impala, on the night in question. *See* Docket No. 10-13, at 82–83.

Against this backdrop, it is vanishingly unlikely that the death certificate could have had an impact on the jury's deliberations. The SJC's decision was entirely reasonable—all the more so when viewed through the deferential lens required by AEDPA.

### 2. *Testimony Regarding Database Searches*

As the SJC ruled, it was error to admit the testimony of a state police analyst who described the results (negative) of database searches for licensing, credit, and financial transactions concerning Harkins. *Trotto*, 487 Mass. at 731–33. Accordingly, the SJC proceeded to consider whether the prosecution had met its burden of proving that the erroneously admitted evidence was harmless beyond a reasonable doubt. Here, too, the SJC's finding of harmlessness was based on its consideration of the inadmissible evidence in the context of the whole trial.

As with the death certificate, the analyst testimony had scant probative significance to begin with. The database search suggested nothing about any particular date or cause of death for Harkins. At best, it tended to show that Harkins had not turned up, at least under his own name, in any financial transactions in the ensuing 20 years after he was seen leaving Suney's Pub with Trotto. As the SJC pointed out:

> [T]he jury were unlikely to have found the analyst's testimony very persuasive; defense counsel effectively brought out on cross-examination that the searches the analyst described would have been unlikely to uncover activity by the victim if he were alive under an assumed identity.

*Id.* at 733.

For purposes of establishing that Harkins had truly disappeared—as opposed to going on the lam—the jury heard testimony far more compelling than any database search. Specifically, the jury heard testimony from friends and relatives who described Harkins as a Worcester local with ongoing family connections and strong ties to the community. Each testified that they never heard from Harkins again after February 15, 1994. *See, e.g.*, Docket No. 10-9, at 131–33 (testimony from the mother of Harkins's daughter that Harkins had plans to take mother and daughter to Chuck E. Cheese on the following Sunday); *id.* at 188 (testimony from Harkins's sister describing his "close" relationship with her and her children); *id.* at 194–95 (testimony from Harkins's daughter that she saw him "every day" and that they had plans to have dinner the week of February 15); Docket No. 10-11, at 36 (testimony of friend that "[w]e played softball together, basketball. We were on the dart team together at Suney's."); *id.* at 159, 165–66 (testimony of manager at Suney's that Harkins was an "extremely dependable" worker who had never failed to show up for work prior to February 16th).

There was also the circumstantial evidence about the manner of Harkins's disappearance, which undercut any suggestion that Harkins had absconded to live elsewhere under another name. When Harkins left Suney's Pub with Trotto, he left behind his jacket, cigarettes, and apartment keys. Coupled with the testimony of friends and relatives, all the circumstances bespeak an abrupt and complete disappearance.

## C.    *SJC's Decision Properly Evaluated the Confrontation Clause Claims*

The SJC assiduously considered both the death certificate and the database testimony under the *Chapman* harmless-beyond-a-reasonable-doubt standard. On each point the SJC's reasoning is cogent and, indeed, compelling. It is difficult to imagine any fairminded jurist reaching a different result. And, of course, the converse is the standard this Court must apply on

habeas review. Petitioner can only surmount the AEDPA threshold if *no* "fairminded jurist" could have reached the same result as the SJC, that the error was harmless beyond a reasonable doubt.

The Supreme Court's decision in *Davenport* underscores the degree of deference owed to a state court decision that has considered and applied the *Chapman* harmless-beyond-a-reasonable-doubt standard. As in that case, the SJC's "conclusions involved neither an unreasonable application of *Chapman* nor an unreasonable determination of the facts." *Davenport*, 596 U.S. at 125. Accordingly, Petitioner's habeas claim challenging the SJC's consideration of the death certificate and the database searches should be denied.[16]

## IV.   The SJC Failed to Evaluate Confrontation Clause Issues with Respect to Sargent's Testimony About Carlo's Prior Statements

As noted above, the jury heard evidence that Trotto had admitted being in the car, and holding the gun, when Harkins was shot. That evidence was presented during the Commonwealth's case-in-chief via the prior grand jury testimony of Anthony Carlo, who testified at trial but claimed not to remember anything about Trotto's statement.

There is no challenge, in this habeas case, to the admissibility at trial of Carlo's 2012 grand jury testimony. However, Petitioner contends that his Sixth Amendment confrontation rights were violated when, during the defense case, the prosecution elicited testimony about Carlo's prior statements to the police in 2002 and 2006. These claimed violations occurred during the prosecution's cross-examination of Worcester police officer Steven Sargent. It is Sargent's testimony that is the focus of Petitioner's final Confrontation Clause argument.

---

[16] Again, because Petitioner has not surmounted the AEDPA threshold, there is no need to reach a *Brecht* analysis. *See Davenport*, 596 U.S. at 134, 138–39.

## A.    *Carlo's Prior Statements (Background)*

There is no gainsaying the importance of Carlo's statements. Although the evidence about those statements reached the jury by different avenues, they all tied back to a statement that Carlo gave to Worcester police officers in March 2002. At that time, Carlo told the police that Trotto had admitted to Carlo that he (Trotto) had been in the car with Samia and Fredette, and that he (Trotto) had held the gun when Harkins was (accidentally) shot. Carlo was asked about the 2002 statement in 2012, when he was immunized and compelled to testify before a grand jury. In that 2012 grand jury testimony, Carlo confirmed much of the information from his 2002 statement. *See* Docket No. 10-13, at 80–85, 100.

The SJC succinctly noted the pivotal significance of this evidence:

> Carlo's grand jury testimony provided the Commonwealth's only direct evidence relating to the victim's death by gunshot in the vehicle and the fate of his body; there was no other evidence that the defendant, who was not present for the traffic stop, was in the vehicle when the victim was killed.

*Trotto*, 487 Mass. at 723–24.

### 1.    *Trial Evidence of Carlo's Grand Jury Testimony*

During the prosecution's case-in-chief, the jury heard about Carlo's 2002 statement through the admission of Carlo's 2012 grand jury testimony,[17] which was admitted as substantive evidence.

The road to the introduction of Carlo's prior grand jury testimony was bumpy. Carlo was called twice as a trial witness. When first called, Carlo claimed a lack of memory, and the prosecution attempted to use his 2012 grand jury testimony to impeach him. *See* Docket No. 10-

---

[17] As the SJC noted, "Carlo ultimately appeared twice before a grand jury, first in 2006 and then in 2012. In the 2006 proceeding, he exercised his right to remain silent, but in 2012 he answered questions to some degree affirming what he said in 2002." *Trotto*, 487 Mass. at 723.

9, at 160–178. Thereafter, the trial judge conducted an evidentiary hearing (without the jury) and determined that Carlo was feigning his lack of memory.[18] This opened the door to admitting Carlo's 2012 grand jury testimony as a prior inconsistent sworn statement. *See* Docket No. 10-13, at 68–71. *See generally Wright v. Marshall*, 656 F.3d 102, 108–10 (1st Cir. 2011) (reviewing Massachusetts law regarding admissibility of inconsistent grand jury testimony for its truth under *Commonwealth v. Daye*, 393 Mass. 55 (1984)). After the trial judge's ruling, Carlo was re-called before the jury and Carlo's prior grand jury testimony was presented to the trial jury, with Carlo on the witness stand reading aloud the answers he had given in 2012. *See* Docket No. 10-13, at 80–95.

Because Carlo was present to be questioned about his prior grand jury testimony, the admission of those prior sworn statements did not infringe upon Petitioner's Confrontation Clause rights. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."). At a minimum, it is safe to say that any claim along those lines would be barred by the AEDPA threshold. Plainly, the admission of the prior testimony was not "contrary to, [and did not involve] an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In any event, Petitioner

---

[18] The trial judge heard voir dire testimony from former Worcester police officer Timothy O'Connor, who recounted a 2006 statement by Carlo that, "if they try to call me to testify, I'm going to get amnesia." Docket No. 10-13, at 14. O'Connor recounted a further statement by Carlo, a couple of days later, to the effect that, "if he got called to court, he would plead the Fifth" and that "if you call me to testify, I'll make a better witness for the defense than the prosecution." *Id.* at 15. After hearing additional voir dire testimony from Carlo (*see id.* at 39–67), the trial judge concluded: "The testimony at the grand jury and the testimony at trial of Mr. Anthony Carlo are inconsistent. I find significant inconsistencies to the testimony. I find, further, that the witness is falsifying or feigning his loss of memory." *Id.* at 69. On this basis, the trial judge ruled "that [Carlo's] grand jury testimony can be presented to the jury as substantive evidence . . . ." *Id.* at 70.

does not raise any Confrontation Clause claim with respect to the admission of Carlo's prior grand jury testimony. *See* Docket No. 15, at 50–59.[19]

2.   *Sargent's Testimony*

The second route by which the jury heard evidence of Trotto's admissions to Carlo was through the testimony of Worcester police officer Steven Sargent. This is the focus of the final Confrontation Clause claim in the habeas petition. After the prosecution rested, Petitioner called Sargent as a witness and questioned him about various photographs that the Worcester police had used in obtaining witness identifications during the investigation into Harkins's disappearance. Docket No. 10-13, at 154–59. On cross-examination, however, the prosecution asked Sargent about statements that Carlo had reportedly made to various Worcester police officers, at times when Sargent was not present.

Sargent testified that Carlo had given a statement to two Worcester police officers, Lieutenant McKiernan and Officer DelRosso, on March 1, 2002. *See id.* at 160. Sargent did not

---

[19] In a rhetorical flourish at the end of his brief, Petitioner blurs the issue by emphasizing the importance of Trotto's admissions without specifying the avenue by which those admissions were put before the jury:

> Where, as the state court acknowledged, evidence of Mr. Trotto's alleged statement to Carlo was the *only* evidence that Harkins was shot or that Mr. Trotto was present, *Trotto*, 487 Mass. at 723-724, it is not possible to conclude, beyond all reasonable doubt, these testimonial statements *did not contribute at all* to the jury's verdict. *See Chapman v. California,* 386 U.S. at 24.

Docket No. 15, at 58–59.

This does not amount to a recognizable claim of error with respect to Carlo's grand jury testimony. *See generally United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Note that, as discussed below, Petitioner's reference to the *Chapman* "beyond a[] reasonable doubt" harmless error standard is wholly misplaced. Review in this Court is under the deferential *Brecht* standard.

simply testify that Carlo had given such a statement; he was permitted to recapitulate the

substance of Carlo's 2002 statement. Sargent testified that Carlo told the police that Trotto had

admitted taking Harkins for a ride along with Fredette and Samia, and that Trotto had told Carlo

"that the gun went off before it was supposed to." *Id.* at 170–71. Sargent further testified that

another Worcester police officer, Timothy O'Connor, had contacted Carlo in 2006, at which time

Carlo had confirmed to O'Connor that Carlo's 2002 statement "was accurate." *Id.* at 168–69. In

addition, Sargent testified that during the 2006 contact with O'Connor, Carlo had threatened to

"get amnesia," "take the Fifth," and "be a better witness for the defense" if the prosecution called

Carlo as a witness. *Id.* at 169.

**B.**     ***The SJC's Review***

In considering Petitioner's direct appeal, the SJC noted Petitioner's challenge to both

routes by which the jury heard about Carlo's statements:

> *Carlo's statements.* The defendant challenges the substantive use of Carlo's grand
> jury testimony, and the testimony about Carlo's statements from Sargent. The latter
> was introduced as part of the Commonwealth's response to a *Bowden* defense.
> Since both Carlo's and Sargent's testimony were objected to at trial, we review for
> prejudicial error, *i.e.*, an error that had more than a "very slight effect" on the jury
> (citation omitted). *Commonwealth v. Lester*, 486 Mass. 239, 247, 157 N.E.3d 83
> (2020).

*Trotto*, 497 Mass. at 722–23.

Before the SJC, Petitioner raised various state law challenges to the admission of Carlo's

prior grand jury testimony, which the SJC rejected. *See* Docket No. 10, at 89–90 (arguing misuse

of leading questions), 441–42 (arguing that questions to Carlo constituted a "perjury trap").

Those state law arguments, however, are not part of the present habeas petition, and Petitioner

did not raise before the SJC any constitutional challenges to the admission of Carlo's prior grand

jury testimony.[20] As discussed below, Petitioner's briefs to the SJC did raise a Confrontation

Clause issue with respect to Sargent's testimony, although the Commonwealth argues that

Petitioner failed adequately to exhaust his claim of constitutional error.

While the SJC found no error in the admission of Carlo's prior grand jury testimony, it

concluded, as a matter of Massachusetts law, that the admission of Sargent's testimony was

error. The SJC noted that the trial judge had admitted Sargent's testimony at the prosecution's

behest, as a sort of rebuttal to evidence adduced by Petitioner's trial counsel, which suggested

that the Worcester police had done a poor investigation and had failed to pursue leads that might

have implicated individuals other than Trotto and his associates. *See Trotto*, 487 Mass. at 724–

26. Termed a *Bowden*[21] defense under Massachusetts law, such an attack on the sufficiency of

police or prosecution procedures may open the door to evidence that would otherwise be

inadmissible, for the purpose of allowing the prosecution to rebut suggestions of police bias or

incompetence.

The SJC noted that, to a degree, such rebuttal of a defense attack is permissible. *See id.* at

725 ("A '*Bowden* defense is clearly a two-edged sword: the more wide-ranging the defendant's

attack on the police investigation, the broader the Commonwealth's response may be.'") (quoting

*Commonwealth v. Avila*, 454 Mass. 744, 754–55 (2009)). The SJC noted, however, that the

---

[20] As he now does in this Court, Petitioner argued that his Sixth Amendment confrontation rights were violated by the admission of *Sargent's* testimony about Carlo's statements (*i.e.*, the second route by which the jury heard about Carlo's statements).

[21] In *Commonwealth v. Bowden,* 379 Mass. 472 (1980) the SJC ruled: "The failure of the authorities to conduct certain tests or produce certain evidence was a permissible ground on which to build a defense . . . . The fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." 379 Mass. at 485–86.

latitude afforded to the prosecution in rebutting a "*Bowden* defense should 'not mean that the case becomes devoid of evidentiary constraint.'" *Id.* (quoting *Avila*, 454 Mass. at 756 n.12).

The SJC found that while it may have been permissible to elicit the *fact* that the police had heard from Carlo in 2002, Sargent's testimony went beyond the limits of fair rebuttal of a *Bowden* defense:

> Here, the fact that the police had been in possession of Carlo's statement in 2002 was admissible to explain why they focused their investigation exclusively on the defendant and his associates rather than pursuing alternative theories. At the same time, the testimony elicited from Sargent exceeded the bounds of what was permissible to establish the adequacy of the police investigation; it allowed the jury to hear at least one possibly relevant new fact (the key thrown in the vent), as well as Carlo's statement to O'Connor that he would "get amnesia," which could have affected the jury's assessment of Carlo's credibility.

*Id.* at 725–26.

Having concluded that there was an error of Massachusetts law in the admission of Sargent's testimony, the SJC proceeded to conduct a harmless error analysis under Massachusetts law. In its harmless error analysis, the SJC noted that most of Sargent's testimony was duplicative of what the jury had heard from the reading of Carlo's 2012 grand jury testimony. The SJC acknowledged, however, that there was some non-duplicative information as well:

> Sargent did present at least one new point, namely that Carlo had claimed to have heard from the defendant that when Moore executed the traffic stop in Millbury, Fredette "threw the key in the air vent" because Samia and Fredette both "thought they were going to get arrested, and they didn't get arrested, and how lucky they were that they didn't get arrested."

*Id.* at 725.[22]

_____

[22] Petitioner argues that there was an additional "new point," namely "Samia's presence in the vehicle when picking Harkins up." Docket No. 15, at 58 (citing Docket No. 10-6, at 171). The transcript, however, contradicts this assertion. At trial, Carlo specifically affirmed that he had

*Footnote continues on following page.*

Apart from injecting new information, the SJC recognized that Sargent's testimony included an item of improper bolstering. This was "Carlo's statement to O'Connor that he would 'get amnesia,' which could have affected the jury's assessment of Carlo's credibility." *Id.* at 725–26. As discussed below, the SJC did not specifically address the fact that Sargent's testimony also included a more direct bolstering statement, namely that Carlo had told O'Connor in 2006 that Carlo's 2002 statement had been "accurate." Docket No. 10-13, at 168–69.

Ultimately, the SJC concluded that the error in admitting Sargent's testimony was harmless:

> We nonetheless are confident that, if the error had not been made, the jury verdict would have been the same. . . . . Almost all the information Sargent conveyed was cumulative; the new detail about the key in the vent was helpful to the Commonwealth's case in chief, but not critical. Inasmuch as all of Sargent's testimony avowedly was based on statements by Carlo, who had testified immediately before Sergeant, the jury were well positioned to evaluate its ultimate reliability.

*Trotto*, 487 Mass. at 726 (citations and internal quotation marks omitted).

Notably, the SJC's decision is silent as to any claim of *constitutional* error with respect to Sargent's testimony. Unlike the SJC's consideration of the death certificate and database search evidence, the SJC's consideration of Sargent's testimony does not include a "harmless-beyond-a-reasonable-doubt" analysis, as required when evaluating a constitutional error. *See generally Chapman*, 386 U.S. at 24. As the SJC has noted, its harmless error standard for ordinary (non-constitutional) trial errors is less protective of defendants than the "harmless-beyond-a-reasonable-doubt" standard. *See Commonwealth v. Ng*, 491 Mass. 247, 256 n.13 (2023)

---

testified before the 2012 grand jury that "they had picked [Harkins] up at Suney's Bar on Chandler Street, and they left with John Fredette, Eli Samia, and Matteo Trotto." Docket No. 10-13, at 81. Such duplication, taken by itself, appears harmless beyond a reasonable doubt, and does not suggest any error cognizable on habeas review.

("Generally, the harmless error standard is more favorable to the defendant than the standards applicable to certain other nonconstitutional errors. Under this more favorable standard, we presume prejudice when faced with a constitutional violation, and such prejudice can be overcome only where the Commonwealth makes an affirmative showing that the error is harmless beyond a reasonable doubt.") (internal citations omitted).

The SJC's conspicuous silence on the question of constitutional error requires the habeas court to consider whether to follow the presumption that a state court adjudicates all claims that are presented to it, or whether the content and context of the SJC's decision effectively rebut that presumption. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

### C.  *Standards of Review: Preservation, Exhaustion, and De Novo Review of Federal Claims in a Habeas Petition*

There are three separate threshold standards to apply when considering Petitioner's claim that the admission of Sargent's testimony about Carlo's prior statements violated Petitioner's constitutional right to confront the witnesses against him:

- Did Petitioner *preserve* his claim at trial? That is, did he adequately alert the trial judge that he was objecting on the basis of a plainly identified, federal, constitutional right?

- Did Petitioner *exhaust* his federal constitutional claim on appeal? That is, in his submissions to the SJC, did he adequately alert that court that he was asserting a claim of error based upon a plainly identified, federal constitutional right?

- Did the SJC *rule*—explicitly or implicitly—on Petitioner's claim of error based on a federal constitutional right? If so, the SJC's decision is subject to deferential review under the AEDPA standard. If not, the issue (if it has been both preserved and exhausted) will be considered de novo.

*See generally Lynch v. Ficco*, 438 F.3d 35, 44 (1st Cir. 2006).

The first threshold, preservation, is essentially a matter of state law. A state court's ruling that an objection was not adequately preserved (and thus was forfeited), ordinarily amounts to an "independent and adequate state ground" for denial of a claimed violation of federal law. *See Coleman v. Thompson*, 501 U.S. 722, 747 (1991). Thus, "if the state court finds a claim was procedurally defaulted at trial, we cannot reach the merits of that claim unless the petitioner meets the federal habeas standards to excuse the procedural waiver." *Lynch*, 438 F.3d at 44.

The second threshold, exhaustion, focuses on whether the petitioner properly presented the claim to the state court—typically an appellate court—so as to meet the requirements of 28 U.S.C. § 2254(b)(1).

And the third threshold focuses on whether the habeas petition "presents a federal claim that was raised before the state court but was left unresolved," in which case this court reviews the claim de novo. *Horton v. Allen*, 370 F.3d 75, 80 (1st Cir. 2004); *see also Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001) ("AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address.").

1.    *Preservation of Petitioner's Error Claim*

a.    The Trial Record

Having expressly invoked *Crawford* in objecting to the introduction of Carlo's 2012 grand jury testimony, Petitioner's trial counsel objected again, later the same day, to Sargent's testimony about Carlo's statements to police officers in 2002 and 2006.

The Commonwealth contends that Petitioner did not adequately preserve his constitutional claim, because his trial counsel only raised a hearsay objection and did not reiterate his reference to *Crawford*. *See* Docket No. 19, at 33 n.19 ("The trial judge was not

alerted to the existence of a federal constitutional issue such that he could address it in the first instance.").

 As noted above, Sargent's testimony came by way of cross-examination when the prosecutor veered into a line of questioning aimed at eliciting Sargent's testimony about Carlo's statements to other police officers in 2002 and 2006. *See* Docket No. 10-13, at 160. Petitioner's counsel objected immediately, citing hearsay and expressly noting that, apart from the fact that Sargent was testifying about Carlo's out-of-court statements, Sargent had not himself heard Carlo's statements but was, instead, testifying about matters that had been conveyed to him in reports from other officers. *Id.* ("Objection, your Honor. It's hearsay. He didn't take [the statement]"). An extended side-bar conference ensued (*id.* at 160–68), during which the trial judge initially suggested that Sargent's testimony should be limited to the *fact* that the police had obtained Carlo's 2002 statement, without allowing testimony about what Carlo had said. *See, e.g.*, *id.* at 163 ("But you don't have to get into the content. You could say, 'Did you receive these reports?' Yes.").

In the course of the side-bar conference, Petitioner's counsel objected that the prosecutor's proposed line of questions was beyond the scope of direct and added, "[t]he second part [of this argument] is[] [the witness is] commenting on somebody else's taking a statement." *Id.* at 162. As to this latter point, the trial judge responded, turning the question to the prosecutor: "I know that. Why is this the person to do that?" *Id.*

Ultimately, the prosecutor prevailed, invoking a broad and grossly overstated (as a matter of state law) assertion that *Bowden* erases constraints on hearsay evidence:

> [PROSECUTOR]: But we wouldn't have been able to put this in, because it's hearsay in our case in chief. It's only because of *Bowden* that it's admissible.
>
> THE COURT: *Bowden*, you can put in hearsay.

45

[PROSECUTOR]: That's right. That's why it's admissible.

*Id.* at 165.

In response, Petitioner's counsel persisted in his objection:

[PETITIONER'S COUNSEL]: *Bowden* doesn't open up hearsay to the fact that he gets to comment on prior witnesses the district attorney called who were in his case. He testified he was not the investigating officer.

*Id.* at 166.

After the trial court permitted Sargent to testify to the content of Carlo's 2002 statement, Petitioner's counsel renewed his objection, expressly noting that Sargent had not been the officer who took that statement:

[PROSECUTOR]: –[W]ithin the beginning of the statement, what did Mr. Carlo indicate in his statement about what Mr. Trotto had told him about what had taken place with Kevin Harkins?

[PETITIONER'S COUNSEL]: Objection, your Honor. *He did not take the statement.*

*Id.* at 170 (emphasis added).

Following Sargent's testimony, there was further discussion, outside the presence of the jury. Petitioner's counsel emphasized not only that Sargent had conveyed statements attributed to Carlo, but that, by allowing Sargent to testify to the substance of Carlo's 2002 and 2006 statements, Petitioner had been prevented from confronting Officer O'Connor, the officer who had actually taken Carlo's 2006 statement:

[PETITIONER'S COUNSEL]: I will call [O'Connor], subject to the right to examine him on the inconsistencies. They have gotten Officer O'Connor's testimony in through the back door. They have to live with that. I'm going to ask, please, for a copy of the transcript of Officer O'Connor and Chuckie Carlo for today. It's my intention to serve Officer O'Connor. It's my intention to fully confront him, not only to his motives, his police procedures, his ability to give truthful and accurate testimony. They back-doored that through Officer Sargent. *The defense has the right to confront that.*

I am going to move to un-impound those documents, your Honor. I will make the *Dwyer* motion appropriately.

*Id.* at 196–97 (emphasis added).[23]

        b.    Analysis

The rules regarding preservation of issues for appeal are matters of state law. A state court finding that an issue has been forfeited is generally fatal to any subsequent effort to raise such an issue by way of a federal habeas petition. The Commonwealth suggests, in a footnote in its brief to this Court, that Petitioner failed adequately to preserve a constitutional claim with respect to Sargent's testimony. *See* Docket No. 19, at 33 n.19. But it did not raise the issue before the SJC. *See* Docket No. 10, at 398 (arguing that Sargent's testimony was properly admitted to rebut *Bowden* defense). Accordingly, there is no state court ruling as to whether Petitioner's trial objections adequately preserved his claim of confrontation error.

As noted above, there is a presumption that even silence from a state court amounts to an adjudication on the merits. *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Put another way, it is not for this Court, on habeas review, to make a determination on the purely state-law matter of whether the trial objection was adequately preserved. As the Supreme Court noted in *Harrington*, "[t]he state court did not say it was denying the claim for any other reason." *Id.*

Absent any ruling by a Massachusetts court on the question of preservation, we look to the trial record itself. And the record reflects that Petitioner adequately apprised the trial judge of his Confrontation Clause objection to Sargent's testimony.

---

[23] As discussed below, Petitioner did not ultimately call O'Connor as a witness.

As a rule, a mere hearsay objection, without more, is insufficient to preserve a claim of Confrontation Clause error. *See, e.g.*, *United States v. Rivera-Rodriguez*, 617 F.3d 581, 594 (1st Cir. 2010) (ruling, in the context of direct appeal—as opposed to habeas review—that the Confrontation Clause claim was "waived" where the only timely objection was to hearsay). But trials are practical undertakings, in which short-hand objections—if they are adequately clear in context—may be just as effective as long disquisitions in alerting the judge of the need for a ruling. Thus, the First Circuit has "looked to the full context of counsel's colloquy with the court in determining whether a *Crawford* challenge was preserved." *United States v. Meises*, 645 F.3d 5, 19 (1st Cir. 2011). In *Meises*, for instance, reference to the fact that the proper witness "is not here" and to the fact that testimony was offered for "the truth of the matter" sufficed to preserve a Confrontation Clause claim for plenary review. *Id.* at 18–19. Similarly, in *United States v. Cabrera-Rivera*, 583 F.3d 26 (1st Cir. 2009), the First Circuit ruled that a *Crawford* claim had been preserved when counsel failed to mention *Crawford*, but instead cited to *Bruton v. United States*, 391 U.S. 123 (1968), an inapposite case that involved interlocking confessions but which, nonetheless, implicated the Confrontation Clause. *See* 583 F.3d at 36.

Petitioner's trial objection on Confrontation Clause grounds was better-focused than the objections that were deemed adequate in *Meises* and *Cabrera-Rivera*. And the context is particularly telling. Petitioner had expressly directed the trial judge to *Crawford*, *by name*, earlier in the day, in connection with the admissibility of Carlo's grand jury testimony about Carlo's original 2002 statement. *See* Docket No. 10-13, at 74. The trial judge's comments make clear that he was fully aware of the holding in *Crawford* and the nuances of its application in this case. *See id.* ("THE COURT: . . . The witness is in the courtroom, however. So it's not quite – it doesn't fit into *Crawford*.").

Given the proximity in time and the similarity in substance of the two sets of objections, and given that Petitioner's counsel specifically used the words, "[h]e did not take the statement," and "[t]he defense has the right to confront that," it is evident that Petitioner adequately signaled his constitutional objection. Docket No. 10-13, at 170, 196.

Petitioner sufficiently preserved his claim of error.

2.    *Appellate Exhaustion of Petitioner's Error Claim*

The Commonwealth asserts that Petitioner failed adequately to raise to the SJC his Confrontation Clause argument with respect to Sargent's testimony. On this basis, the prosecution contends that the claim should be rejected for want of exhaustion.

The record contradicts the Commonwealth's assertions. The briefs submitted to the SJC reflect that Petitioner explicitly raised his Confrontation Clause claim with respect to Sargent's testimony, even introducing the topic with an explicit reference to "testimonial hearsay":

> Unwilling to leave well enough alone, the prosecutor sought to bolster Carlo's grand jury "testimony" with *testimonial hearsay*. The prosecutor did this when cross examining Det. Steven Sargent, who was recalled as a witness during the defense case for the limited purpose of testifying about "lost" discovery . . . .

Docket No. 10, at 90 (emphasis added).

Petitioner went on to emphasize this constitutional claim of error, as follows:

> The alleged out of court statements made by Carlo in response to police investigation were obviously testimonial. *Middlemiss, supra; Davis v. Washington, supra.* Defense counsel's efforts to confront this evidence with reference to Det. O'Connor's record of misconduct (Tr.6/172-173), Carlo's interest in receiving consideration and unfulfilled promises from Det. O'Connor (Tr.6/175-176), Carlo's health issues (Tr.6/172-173), and Carlo's record (Tr.6/174), fall far from curing the inability to exercise the right of confrontation. Indeed, they highlight the violation.

*Id.* at 92.

The prosecution disparages this as "a singular reference to the Supreme Court's Confrontation Clause case of *Davis v. Washington*, 547 U.S. 813 (2006), without any pinpoint

citation" and contends that "the petitioner did not engage in any substantive Confrontation

Clause analysis." Docket No. 19, at 32. But this is hardly fair. The caselaw references in the

portion of the brief that addressed Sargent's testimony had been fully spelled out in a previous

section of the brief, along with an express reference to *Crawford*:

> Introduction of the statements of Samia and Fredette also violated Trotto's
> confrontation rights under our common law rules of evidence, the Sixth
> Amendment, and art. 12. *Crawford*, 541 U.S. at 68. *Wardsworth, supra* at 463-464;
> *Commonwealth v. Middlemiss*, 465 Mass. 627, 633 (2013). "A statement made in
> response to police questioning is testimonial where 'the primary purpose of the
> interrogation is to establish or prove past events potentially relevant to later
> criminal prosecution.'" *Middlemiss, supra*, quoting *Davis v. Washington*, 547 U.S.
> 813 (2006).

Docket No. 10, at 85.

Petitioner cannot be faulted for citing *Davis v. Washington*, a post-*Crawford* decision of

the United States Supreme Court that applied *Crawford* in the precise context of police testimony

about witness interviews. Petitioner's citation of an on-point decision by the Supreme Court

plainly signaled that the claimed error was one of federal constitutional law.

      3.    *The SJC Overlooked Petitioner's Confrontation Clause Claim with Respect to Sargent's Testimony*

There is, as discussed above, a presumption that the decision of a state appellate court,

even if it is silent on a particular issue, constitutes an adjudication on the merits. As the Supreme

Court has noted, "[w]hen a federal claim has been presented to a state court and the state court

has denied relief, it may be presumed that the state court adjudicated the claim on the merits in

the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562

U.S. at 99.

The presumption of merits adjudication is not absolute. "The presumption may be

overcome when there is reason to think some other explanation for the state court's decision is

more likely." *Id.* at 99–100. Reaching such a conclusion, however, is no small matter. As the

Supreme Court has cautioned, only "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court" does "§ 2254(d) entitle[] the prisoner to an unencumbered opportunity to make his case before a federal judge." *Johnson*, 568 U.S. at 303.

This appears to be such a case. The SJC is amply familiar with the harmless-beyond-a-reasonable-doubt standard for constitutional errors, commonly referred to in the federal context as *Chapman* review. *See, e.g.*, *Commonwealth v. Tyree*, 455 Mass. 676, 701 (2010) ("We have recognized that a constitutional violation gives rise to presumptive prejudice that can be overcome only where the Commonwealth makes an 'affirmative showing' of harmlessness beyond a reasonable doubt.") (citations omitted). Indeed, as discussed above, the SJC in this case carefully and explicitly applied the harmless-beyond-a-reasonable-doubt standard when it considered the impact of the erroneously admitted death certificate and database search results:

> Where, as here, a defendant objects to evidence that was admitted in violation of his or her constitutional rights, we review "to determine whether it was harmless beyond a reasonable doubt" (citation omitted). *Wardsworth*, 482 Mass. at 458, 124 N.E.3d 662. We conclude that the introduction of the certificate was harmless error.

*Trotto*, 497 Mass. at 730.

Nor is there any reason to think that the SJC would have somehow rolled a "harmless beyond a reasonable doubt" standard into its generic (state law) harmless error analysis. On the contrary, in considering Petitioner's challenge to the admission of database search results, the SJC carefully differentiated the separate standards of review implicated when there was both a conventional error of evidence law and a Confrontation Clause violation. *See id.* at 732 ("Because the analyst's statements were not relevant to any real *Bowden* defense, they were inadmissible hearsay. The hearsay in the analyst's testimony, however, additionally was

testimonial, thus implicating the defendant's constitutional rights under the confrontation clause.").

With respect to Sargent's testimony, the SJC conducted a detailed harmless error review—treating the matter as one of ordinary evidentiary error. Given the SJC's painstaking attention to the particulars of Sargent's testimony and its relationship to the evidence as a whole, it is inconceivable that the SJC could have noticed and tacitly ruled upon the closely related, but more demanding, harmless-beyond-a-reasonable-doubt standard for the Confrontation Clause claim that arises from precisely the same evidence. Under the circumstances of this case, the SJC's silence signals that the issue was inadvertently overlooked.[24]

    4.    *Absent Adjudication by the SJC, the Court Considers Petitioner's Constitutional Claim De Novo*

Because the SJC did not evaluate Sargent's testimony with respect to the Confrontation Clause, it cannot be said that the *Trotto* opinion was "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of the Supreme Court. Under such circumstances, there is effectively nothing to consider under the AEDPA standard. As the First Circuit has phrased the dilemma, "AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address." *Fortini*, 257 F.3d at 47.

It is commonly stated that a federal constitutional claim that was raised but not addressed in state court is subject to "de novo" review in the habeas context. *See, e.g.*, *Clements v. Clarke*,

---

[24] The Commonwealth's briefs to the SJC, on direct appeal, missed the Confrontation Clause issue altogether and focused instead on the—ultimately futile—argument that Sargent's testimony was properly offered under *Bowden* to rebut Petitioner's aspersions upon the quality of the police investigation. *See* Docket No. 10, at 398 ("Finally, Sergeant Sargent's testimony to Carlo's statements was properly admitted in response to the defendant's *Bowden* defense.").

592 F.3d 45, 53 (1st Cir. 2010) ("Were we to find that the state court had relied solely on state standards that did not implicate federal constitutional issues, we would review the matter de novo.") (citing *DiBenedetto v. Hall*, 272 F.3d 1, 6–7 (1st Cir. 2001)). But the term "de novo" is something of a misnomer in this setting. Review in such cases is de novo in the sense that it is a matter for plenary decision by the federal court. There is no state court decision to which deference may be paid. And it does require a searching review of the entire trial record. *See Brecht*, 507 U.S. at 642 (Stevens, J., concurring) ("The purpose of reviewing the entire record is, of course, to consider all the ways that error can infect the course of a trial."). But de novo review in a habeas matter does not put this Court into the shoes of the SJC. Specifically, the habeas court is not called upon to apply the *Chapman* harmless-beyond-a-reasonable-doubt standard.

In this regard, Petitioner is flatly incorrect about the standard to be applied. *See* Docket No. 15, at 56–59 (arguing for *Chapman* harmless-beyond-a-reasonable doubt review).[25] Instead, the federal court must apply the longstanding *Brecht* standard. The Supreme Court has expressly required this approach in circumstances directly analogous to the matter at bar. *Fry v. Pliler*, 551 U.S. 112 (2007), was a case where the underlying state appellate decision had overlooked a federal constitutional issue and had failed to apply the *Chapman* harmless-beyond-a-reasonable-doubt analysis. In *Fry,* the Supreme Court wrote:

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht, supra,* whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman*, 386 U.S. 18,

---

[25] For its part, the Commonwealth's brief is no clearer on the point. *See* Docket No. 19, at 36–37 (noting that the SJC's harmless error analysis touched on "factors, which are relevant to whether a Confrontation Clause error was harmless beyond a reasonable doubt").

87 S.Ct. 824, 17 L.Ed.2d 705. Since the Ninth Circuit correctly applied the *Brecht* standard rather than the *Chapman* standard, we affirm the judgment below.

551 U.S. at 121–22.[26]

Under the *Brecht* "substantial and injurious effect" standard, the burden is on Petitioner to prove that the error resulted in "actual prejudice":

> The test under *Kotteakos* is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 328 U.S., at 776, 66 S.Ct., at 1253. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."

*Brecht*, 507 U.S. at 637.

### D.    *Applying the "Actual Prejudice" Brecht Standard to Sargent's Testimony*

Although habeas review under *Brecht* requires a de novo perusal of the record, such review will, in this case, tread much the same ground as did the SJC when it considered the harmfulness (albeit under standards of Massachusetts law) of Sargent's erroneously admitted testimony. The SJC recognized that it was error to permit Sargent to testify about the content of Carlo's prior statement(s) and recognized that Sargent had presented additional details from Carlo's 2002 statement that had not been covered in Carlo's trial testimony. *See Trotto*, 487 Mass. at 725–26. And the SJC expressly noted that—on top of the reiteration of Carlo's 2002 statement—Sargent had erroneously been permitted to recount Carlo's threat in 2006 that, if called to testify, he would "get amnesia." *Id.* at 725.

---

[26] The Supreme Court's decision in *Davenport* limits the reach of *Fry* to the extent that it clarifies that the *Brecht* analysis does not automatically encompass the AEDPA analysis. *See Davenport*, 596 U.S. at 139 ("*Fry* never said[] that a *Brecht* inquiry *always* subsumes an AEDPA inquiry."). In cases such as this one, however, the *Fry* holding applies with full force. *See id.* at 138 ("As we have seen, and as was the case in *Fry*, if a state court has not adjudicated the petitioner's claim on the merits, AEDPA falls away.").

What the SJC did not consider, and what this Court must review, is that several aspects of Sargent's testimony involved violations of Petitioner's Confrontation Clause rights, as explicated in *Crawford* and its progeny.

Before this Court, Petitioner's claims of prejudice hinge on four aspects of Sargent's testimony that went beyond a simple reiteration of Carlo's grand jury testimony, namely that: (1) Sargent recounted additional details about the traffic stop that the jury had not previously heard; (2) allowing Sargent to testify shielded O'Connor from cross-examination; (3) Sargent's testimony about Carlo's statements to O'Connor in 2006 bolstered the credibility of Carlo's 2002 statement; and (4) Sargent's testimony highlighted for the jury the factual basis for questions that Sargent had asked Trotto in an interview in July 2006 (a recording of which had been introduced in evidence). I will address these in turn.

### 1.    *Additional Information about the Traffic Stop*

In his brief to this Court, Petitioner points out that Sargent's testimony added details from Carlo's 2002 statement that were not included in the portion of Carlo's prior grand jury testimony that was presented at trial. These additional details concerned the 2 a.m. traffic stop when Fredette and Samia were questioned by a Millbury patrol officer. *See* Docket No. 15, at 58. Petitioner notes that the jury had not previously heard about "Samia and Fredette throwing a key to the trunk in the air vent to prevent the police from opening the trunk when pulled over at 2 a.m." *Id*. Nor had the jury heard that Samia and Fredette had expressed relief at not being arrested. *Id.*

There was no dispute—indeed, the jury had heard from the testifying police officer— that Trotto was not in the car at the time of the traffic stop. *See* Docket No. 10-12, at 53–55. So, the significance of additional testimony about what Samia and Fredette did at that time is limited,

particularly since the jury had already heard (without constitutional error) that Trotto had been in the car, holding the gun, when Harkins was shot.

The potential significance of the trunk key is that it dovetailed with the Millbury patrol officer's testimony that he had been unable to search the Impala's trunk because Fredette told him the key was missing. *See id.* at 58 ("I learned from Mr. Samia that he did not have a key for the glove box or trunk, which I found suspicious."). It is doubtful that there was any particular significance in the information that Samia and Fredette were relieved at not being arrested and it is difficult to see how this could have affected any part of the jury's consideration of the evidence.

To the extent that Sargent's testimony introduced additional information that was not covered in Carlo's trial testimony, the impact of that additional information on the case against Trotto was minimal. Anything Trotto told Carlo about what Fredette and Samia did when Trotto was absent would have been second-hand information to begin with. These additional details do not add anything, one way or the other, that would have affected the jury's consideration of the veracity of Carlo's reported statements about Trotto's role in Harkins's disappearance.

Had the issue been significant, Petitioner's counsel could have re-called Carlo as a witness to explore these additional details. Indeed, he announced his intention to recall Carlo, but ultimately opted not to. That decision—which appears unremarkable as a matter trial strategy[27]—underscores the point that there was little, if any, additional value in confronting Carlo about the details of the traffic stop.

---

[27] As discussed below, Petitioner's trial counsel had successfully educed from Carlo every major point he had advanced in his cross-examination. Presumably, he saw little upside in circling back.

To the extent that Sargent's testimony may have deprived Petitioner of his opportunity to confront Carlo (the actual declarant) about additional details revealed in Sargent's testimony, it did not have a "substantial and injurious effect" on the jury's consideration of the evidence.

2.    <em>Shielding Officer O'Connor from Cross-Examination</em>

A second point of confrontation error in Sargent's testimony was in Sargent's recounting of a conversation between Officer O'Connor and Carlo in 2006. This was introduced as a backdrop to Sargent's own interview of Trotto in 2006, which the jury heard as a tape-recorded interview. *See* Docket No. 10-10, at 22–26.

Sargent's testimony regarding O'Connor's report of his 2006 conversation with Carlo was as follows:

> [PROSECUTOR]: Now, before you went up and interviewed Mr. Trotto, did Timothy O'Connor, Lieutenant -- at that time I believe it was Sergeant O'Connor --
>
> [SARGENT]: Mm-hmm.
>
> [PROSECUTOR]: -- contact Chuckie Carlo?
>
> [SARGENT]: Yes.
>
> [PROSECUTOR]:  And when he contacted Chuckie Carlo, did Mr. Carlo indicate to him whether or not his 2002 statement was truthful?
>
> [SARGENT]: Yes, he did.
>
> [PETITIONER'S COUNSEL]: Objection, your Honor. That's hearsay.
>
> [THE COURT]: Overruled.
>
> [SARGENT]: Yes, he said it was accurate.
>
> [PROSECUTOR]: And did he indicate whether or not he would be cooperating with the Commonwealth in the future?
>
> [SARGENT]: He said he would not.
>
> [PROSECUTOR]: What did he say he would do if he was going to be called to testify?

[SARGENT]: He would get amnesia.

[PROSECUTOR]: Now, the report you received from Sergeant O'Connor --

[SARGENT]: Yes, sir.

[PROSECUTOR]: -- did he also indicate to you, before he went up to see Mr. Trotto and interview him, did he also indicate to you about what Mr. Carlo was going to do if he was called to be a witness?

[SARGENT]: Yes, he did.

[PROSECUTOR]: And what did Mr. Carlo tell him he was going to do?

[SARGENT]: He was going to take the Fifth.

[PROSECUTOR]: And did Mr. Carlo indicate who he would be a better witness for?

[SARGENT]: Yes, he did.

[PROSECUTOR]: Who did Mr. Carlo say he would be a better witness for?

[SARGENT]: He said he would be a better witness for the defense.

Docket No. 10-13, at 168–69.

The potential significance of this testimony about Carlo's 2006 statement was twofold. First, there is the bolstering effect of O'Connor's report that Carlo had acknowledged the truth of his 2002 statement in 2006. Second, there is the impeaching effect of O'Connor's report that Carlo had threatened to feign amnesia, which undermines the credibility of Carlo's protestations at trial that he lacked any memory of the critical events. By itself, the simple bolstering effect seems minor. After all, the jury had heard Carlo's 2012 sworn grand jury testimony acknowledging much of the substance of the 2002 statement. More significant is the combination of the bolstering with the description of Carlo's threat to feign amnesia. Together, these statements painted a picture for the jury, casting Carlo as a witness dishonestly seeking to disavow his prior statements that incriminated Trotto.

In all likelihood, the substance of Carlo's 2006 statements, including his threats to "get amnesia" and to be a "better witness for the defense," could properly have been admitted to impeach Carlo.[28] But Sargent plainly was not a competent witness to introduce such evidence. O'Connor, not Sargent, was the one who heard Carlo's statements. Petitioner had a right to confront O'Connor about the contents of his conversation with Carlo and to impeach O'Connor's credibility.

There was considerable material available for the defense to use in impeaching O'Connor. Indeed, Petitioner's counsel had done so at length that morning when conducting the voir dire (without the jury) that preceded the trial judge's finding that Carlo was feigning a lack of memory. As Petitioner's counsel pointed out to the trial judge, O'Connor had resigned from the Worcester Police Department in the face of an investigation into police overtime abuses.[29] *See* Docket No. 10-13, at 19–23, 28–29. Petitioner's counsel also noted that O'Connor's truthfulness in prior cases had been impugned by at least one other judge. *See id.* at 23, 33–35.

Later that afternoon, in objecting to Sargent's testimony, Petitioner's counsel emphasized that O'Connor was, in effect, being shielded from cross-examination:

> Because the Commonwealth doesn't want to call Officer O'Connor and get him in front of this jury to say that he's under investigation by the Worcester Police Department, to say that he's been found to be non-truthful. If they want that, put

---

[28] Such statements would likely have been admissible to contradict or impeach Carlo's trial testimony claiming he had no memory of Trotto's admissions, particularly if Carlo had been confronted with the statements and been given an opportunity to explain or deny them. *Cf. Com. v. Parent*, 465 Mass. 395, 399–400 (2013) ("The rule of evidence is well settled that if a witness either upon his direct or cross-examination testifies to a fact which is relevant to the issue on trial the adverse party, for the purpose of impeaching his testimony, may show that the witness has made previous inconsistent or conflicting statements, either by eliciting such statements upon cross-examination of the witness himself, or proving them by other witnesses.").

[29] Petitioner's trial counsel was permitted to explore the point briefly in his examination of Sargent. *See* Docket No. 10-13, at 172–73.

> Officer O'Connor up there, and let me cross-examine him. Or I'll put him under
> subpoena, and I'll put him up there. But this officer [Sargent] does not get to put
> that in.

*Id.* at 168. A cross-examination of O'Connor could have provided an opportunity to cast

O'Connor in an unflattering light in front of the jury.

There was an obvious cure for the Confrontation Clause error that Petitioner now raises:

O'Connor himself was available to testify. But Petitioner declined to avail himself of that cure at

trial. Earlier the same day, during voir dire, Petitioner's counsel had a fulsome dress-rehearsal

for a hostile examination of O'Connor. During a colloquy concerning prospective defense

witnesses, Petitioner's counsel declared his intention to call O'Connor to testify, and the trial

court expressly allowed him to do so:

> [THE COURT]: Well, [evidence about the overtime investigation] hasn't come out
> -- well, it has a little to the jury. But as far as testimony, Officer O'Connor has not
> testified in this case yet. You are free to call him.
>
> [PETITIONER'S COUNSEL]: I will call him, subject to the right to examine him
> on the inconsistencies. They have gotten Officer O'Connor's testimony in through
> the back door. They have to live with that. I'm going to ask, please, for a copy of
> the transcript of Officer O'Connor and Chuckie Carlo for today. It's my intention
> to serve Officer O'Connor. It's my intention to fully confront him, not only to his
> motives, his police procedures, his ability to give truthful and accurate testimony.
> They back-doored that through Officer Sargent.
>
> The defense has the right to confront that.
>
> I am going to move to un-impound those documents, your Honor. I will make the
> Dwyer motion appropriately. I will have it for Tuesday morning. And, yes, that is
> my intention. Absolutely.
>
> [THE COURT]: Okay. Like I said, Officer O'Connor has not yet testified in this
> case. The defense is free to call him.

*Id.* at 196–97.

Ultimately, Petitioner did not call O'Connor as a witness. Instead, in closing argument, Petitioner pointed out O'Connor's absence, identifying it as a gap in the prosecution's case. *See* Docket No. 10-15, at 80.

It is evident that Petitioner's trial counsel made an informed and rational decision in deciding not to call O'Connor as a witness. As a matter of trial tactics, it probably made sense to leave well enough alone; calling O'Connor likely posed more peril here than promise. On the one hand, there may have been some incremental value to the defense in allowing the jury to see O'Connor confronted directly about the police overtime investigation, rather than having the jury hear about it indirectly from Sargent. *See* Docket No. 10-13, at 172–73. On the other hand, the overtime investigation was a collateral matter, and trial counsel had every reason to fear that allowing the jury to hear directly from O'Connor would give the prosecution an opportunity to flesh out and amplify Carlo's motives to disavow his 2002 statement.[30]

Of course, it is not the task of this Court to review Petitioner's trial strategy. The key point is that Petitioner had every opportunity to call O'Connor back to the witness stand. That

---

[30] During his voir dire questioning, O'Connor had provided a more fulsome account of Carlo's reasons denying his 2002 statement than anything Sargent testified to:

> [PROSECUTOR]: And did [Carlo] indicate why he didn't want to cooperate any more with the detective bureau?
>
> [O'CONNOR]: Yes. He stated to me that he had given that statement, and he also stated that he had passed a lie detector test, but he stated that, in his opinion, certain promises were made to him that were not kept by Lieutenant McKiernan from the detective bureau.
>
> [PROSECUTOR]: And, in particular, what did he say about him going to jail when promises were made?
>
> [O'CONNOR]: He stated that he had given that statement, and he was under the impression that they were going to keep him out of jail. But he went to jail for six months, and while he was in jail, he was labeled a rat.

Docket No. 10-13, at 9–10.

Petitioner chose not to speaks volumes. Given that Petitioner passed up the recognized and available opportunity to correct the problem during trial, it is difficult to credit that allowing Sargent to testify really denied Petitioner his right to confront O'Connor, or that any such denial resulted in "actual prejudice."

### 3.   *The Bolstering Effect of Sargent's Testimony*

In considering the impact of the Confrontation Clause error—allowing Sargent to testify in O'Connor's stead—it is critical to note that O'Connor was not involved in taking the critical statement from Carlo in 2002. It is the substance of the 2002 statement that matters here. In this regard, neither Sargent nor O'Connor was the real witness; *Carlo* was. The central Confrontation Clause problem here is that admitting the testimony of a police officer *could* have denied Petitioner a fair opportunity to confront that real witness (had Carlo himself not been called to testify).

If Sargent's account of O'Connor's 2006 conversation with Carlo had been the main evidence upon which the jury could weigh the truthfulness of Carlo's 2002 statement, the effect of shielding O'Connor from cross-examination would loom large. But with the broader trial record in view, it is evident that the back and forth about Carlo's conversations with O'Connor in 2006 were tangential, at best.

The central evidence about the veracity of Carlo's 2002 statement was Carlo's own testimony, which cut both ways. On the one hand, regardless of what Carlo said to O'Connor in 2006, the jury heard Carlo's sworn 2012 grand jury testimony that effectively adopted the key components of his 2002 statement. On the other hand, the jury heard Carlo's testimony in open court, during which Carlo acceded to an array of suggestions from Petitioner's trial counsel, including that:

- Carlo has "had memory issues going back to the 1980's." Docket No. 10-13, at 90.

- Carlo had been told by the prosecutor that "he wanted [Carlo] to give certain testimony at the grand jury." *Id.* at 91.

- Carlo had told the prosecutor that he "had no memory of the events [the prosecutor] was asking for." *Id.*

- The prosecutor had threatened "to indict [Carlo] for giving perjured testimony if [Carlo] said that." *Id.*

- The prosecutor had threatened that "if [the prosecutor] indicted [Carlo], it could be a sentence up to life." *Id.* at 92.

- Carlo was "afraid to go to jail for life." *Id.* at 95.

- Carlo "read a lot about this case over the years." *Id.*

- Carlo "had conversations with a lot of people." *Id.* at 95–96.

- "Mr. Trotto never said, 'This is what I did.'" *Id.* at 96.

- Trotto "never told [Carlo], 'I took [Harkins] for a ride. I took him in a car.'" *Id.*

- Carlo did not remember Trotto ever "saying anything that [Trotto] was involved in this case[.]" *Id.*

- Carlo did not remember Trotto ever telling Carlo, "I did this." *Id.* at 97.

In short, under cross-examination, Carlo all but repudiated his 2012 grand jury testimony (and thereby also repudiated his 2002 statement).

Against the backdrop of Carlo's own diametrically inconsistent testimony, it is difficult to imagine that any further confrontation of a second-hand witness could have made a difference. It was Carlo's credibility, not O'Connor's, that mattered.

Petitioner's trial counsel had the opportunity to re-call both O'Connor and Carlo. Indeed, Petitioner's trial counsel had announced (outside the jury's presence) his intention to do so. *See* Docket No. 10-13, at 177–79. That Petitioner chose not to do so calls into question whether there was any actual Confrontation Clause violation and dispels any suggestion that such a violation of his confrontation rights was materially prejudicial to his defense.

4.      *Backstopping Sargent's Questions to Trotto*

Early in the trial, Sargent was called in the prosecution's case-in-chief to authenticate a recording of an interview of Trotto, which Sargent had conducted on July 27, 2006. *See* Docket No. 10-10, at 21–23. In that interview, Sargent had asked Trotto questions that were based on Carlo's 2002 statement. In response, Trotto denied any involvement in Harkins's disappearance.

Petitioner points out that, after the defense called Sargent late in the trial, the prosecution elicited Sargent's description of Carlo's 2002 statement as part of an effort to add substance to the questions that Sargent had asked of Trotto in the recorded interview. *See* Docket No. 10-13, at 163–65 (sidebar comments by prosecutor). The intended effect, Petitioner argues, was to add undue heft to Sargent's questions (which Trotto had denied), by linking those questions to Carlo's statement about what Trotto had told him. *See* Docket No. 15, at 57 ("By doing so, the prosecutor equated all of the information suggested in Det. Sargent's questions to Trotto with testimonial hearsay statements made by Carlo.").

Petitioner's argument on this point is substantially undercut by the fact that, earlier the same day, the jury had properly heard the substance of Carlo's 2002 statement through Carlo's reading of his 2012 grand jury testimony. *See* Docket No. 10-13, at 80–85. While Sargent's recapitulation of the 2002 statement may well have violated the Confrontation Clause, any incremental impact of this duplicative testimony was minimal. As noted above, on the central question of how the jury weighed Carlo's statement, Sargent's testimony was tangential. As for Sargent's interview of Trotto, the jury would reasonably have understood—whether Sargent testified about it or not—that the questions posed to Trotto were derived from Carlo's statement.

In any event, the probative value of Sargent's 2006 interview of Trotto was not in Sargent's questions, nor even in Trotto's responses to those questions. Rather, the prosecution's major argument was that Trotto's denials went too far in disclaiming any relationship with

Harkins, to the point of straining credulity. In closing argument, the prosecutor contended that Trotto had falsely minimized his interactions with Harkins, had unconvincingly pretended to have been mistaken about Harkins's name, and had falsely understated his familiarity with Suney's Pub. *See* Docket No. 10-15, at 87 ("Matteo Trotto says he's only been in Suney's once, and that's for lunch. And you know that he is not in there that day for lunch . . . . [H]e knows he has to separate himself from Suney's, he has to separate himself from Kevin Harkins because he knows what happened."), 90 ("Do you believe in 2006 [Trotto] doesn't know Kevin Harkins' name? He thinks it might be Kevin Hawkins."). The prosecutor's closing argument did not point to any connection between Trotto's interview and Carlo's 2002 statement.

## E.  *Petitioner Cannot Establish that any Confrontation Error with Respect to Sargent's Testimony Caused Actual Prejudice*

Having discussed the limitations of Petitioner's arguments about the particular issues that Petitioner identifies in connection with Sargent's testimony, this Court must also weigh the significance of Sargent's testimony in the context of the overall trial record. The task, after all, is to determine whether the confrontation error(s) in admitting Sargent's testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

To place Sargent's testimony in context, three points stand out:

First, the salient aspects of Sargent's testimony concerned information that was already properly before the jury, namely the contents of Carlo's 2002 statement about the manner in which Harkins met his death. Accordingly, habeas review must focus on any incremental impact of Sargent's improper testimony. Apart from needless repetition, the Sargent testimony added nothing of substance to the evidence against Petitioner.

Second, Carlo himself had been called as a trial witness earlier on the same day as the jury heard Sargent's testimony, and Carlo was available to testify further. *See* Docket No. 10-13,

at 178–79 (noting Petitioner's intention to re-call Carlo as a witness). While the admission of Sargent's testimony might arguably have impinged upon Petitioner's right to confront the true witness against him, Petitioner had ample opportunity to confront Carlo himself and could have re-called Carlo to the witness stand, if there had been more ground to cover. By the same token, if there were any value in allowing the jury to hear directly from O'Connor, Petitioner had the opportunity to do that as well, but declined.

Third, Petitioner's cross-examination of Carlo had thoroughly developed for the jury the bases for Petitioner's contention that Carlo's 2002 statement to the Worcester police was unworthy of belief. Assuming the admission of Sargent's testimony may have improperly shielded O'Connor from direct confrontation on collateral matters, the impact of such questioning would have been negligible. Indeed, Petitioner's counsel appears to have made a tactical decision not to call O'Connor directly.

Whether considered separately or cumulatively, the potential impact on the jury of the claimed confrontation error(s) with respect to Sargent's testimony is too slight to amount to "actual prejudice." Upon a plenary review of Petitioner's constitutional claims, the record does not support a determination that any confrontation error connected with Sargent's testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Accordingly, Petitioner's habeas claims with respect to Sargent's testimony should be denied.

<u>CONCLUSION</u>

For the reasons set forth above, I RECOMMEND that the habeas petition [Docket No. 1] be DENIED.[31]


Dated: March 6, 2024                              /s/ Paul G. Levenson
                                                  Paul G. Levenson
                                                  U.S. MAGISTRATE JUDGE

---

[31] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).